# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 15 |
| Hellas Telecommunications (Luxembourg) V, | Case No. 10-_____ (    ) |
| Address:  55 Old Broad Street, London<br>EC2M 1RX United Kingdom, | **Proposed Hearing Date and Time:  December 13, 2010 at [___]m. (EST)**<br>**Proposed Objection Deadline:  December 7, 2010 at 4:00 p.m. (EST)** |
| Debtor in a Foreign Proceeding. |  |

## VERIFIED PETITION FOR RECOGNITION
## OF FOREIGN MAIN PROCEEDING
## SUPPLEMENTING "VOLUNTARY PETITION" [DOCKET NO. 1]
## AND MOTION FOR RELATED RELIEF GIVING
## FULL FORCE AND EFFECT TO UK SCHEME OF ARRANGEMENT

Alastair Beveridge (the "Petitioner"), duly appointed by a November 1, 2010 resolution

(the "Resolution of Appointment") of the general partner and sole manager of Hellas

Telecommunications (Luxembourg) V ("HTV," or the "Debtor"), Hellas Telecommunications

(Luxembourg), a société à responsabilité limitée (private limited liability company) incorporated

under the laws of Luxembourg ("HTVI"), acting through its managers, and declared as

authorized to act by a November 4, 2010 order (the "Convening Court Order") of the Chancery

Division (Companies Court) of the High Court of Justice of England and Wales (the "UK

Court") as the foreign representative of a voluntary restructuring proceeding (the "UK

Proceeding") concerning the Debtor currently pending before the UK Court, acting in such

capacity and by and through his undersigned counsel, respectfully submits this verified petition

in furtherance of the Form of Voluntary Petition filed concurrently herewith [Docket No. 1]

(collectively herewith, the "Petition") for entry of an order (i) recognizing the UK Proceeding as

a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"),[1] (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a) and 1525(a) of the Bankruptcy Code in support of the restructuring of the Debtor and certain of its affiliates under English law (the "Restructuring") through, among other things, a scheme of arrangement (the "Scheme"), if such Scheme is duly approved by a requisite majority of affected creditors and sanctioned by the UK Court, all in accordance with applicable English law. In support of the Petition, the Petitioner has filed concurrently herewith and incorporated herein by reference (a) the Declaration of Michael Corner-Jones pursuant to 28 U.S.C. § 1746 (the "Corner-Jones Declaration")[2] [Docket No. 3] and (b) the Declaration of Christian Pilkington pursuant to 28 U.S.C. § 1746 (the "Pilkington Declaration") [Docket No. 4] and respectfully represents as follows:

## BACKGROUND

### A. The Debtor, Its Corporate Group Structure, and the Foreign Representative

1. HTV, a société en commandite par actions (partnership limited by shares) incorporated under the laws of Luxembourg, is the issuer of €1,222,250,000 of senior secured notes due 2012 (the "SSNs," and the holders thereof, the "Senior Secured Noteholders") pursuant to that certain amended and restated indenture dated as of October 7, 2005, as amended and restated on December 18, 2006 (and as further amended and supplemented up to the date hereof, the "Senior Secured Indenture," and the debt thereunder, the "Senior Secured Debt") and between, among others, The Bank of New York (now known as The Bank of New York Mellon) as Trustee (the "Trustee"), J.P. Morgan Europe Limited as Security Agent and HTV. As discussed in more detail below, it is the claims arising from and evidenced by the Senior Secured

---

[1] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.
[2] True and correct copies of each of the Resolution of Appointment and the Convening Court Order are attached to the Corner-Jones Declaration as Exhibits B and C, respectively.

Indenture and certain related documents (the "Senior Secured Note Documents,"[3] and such

claims, the "Scheme Claims") that are the primary claims to be restructured through the Scheme.

2.  HTV, Hellas Telecommunications (Luxembourg) III ("HTIII"), a société en

commandite par actions incorporated under the laws of Luxembourg, and HTVI are each

subsidiaries of WIND Hellas Telecommunications S.A. ("WIND Hellas," and together with

HTIII, HTV, and HTVI, the "WIND Hellas Group"), a société anonyme organized under the

laws of Greece.

3.  WIND Hellas wholly owns each of HTVI, HTIII and HTV.[4]  WIND Hellas and its

sister company, Hellas Telecommunications IV ("HTIV"), a société à responsabilité limitée

incorporated under the laws of Luxembourg, are each wholly owned by Weather Finance III

S.à r.l. (the "Existing Parent," and together with its direct and indirect subsidiaries, the "Existing

Group"), a société à responsabilité limitée also incorporated in Luxembourg.

4.  The Existing Group is at present indirectly owned by Weather Investments S.p.A.

("Weather"), a Società per Azioni (stock corporation) incorporated under the laws of Italy.[5]  The

Debtor's Scheme is part of the larger Restructuring of the Existing Group that, if successful, will

---

[3] The Senior Secured Note Documents include:

   (a)   the Senior Secured Indenture (including any guarantees contained therein);
   (b)   the SSNs;
   (c)   any guarantees of members of the Existing Group (as defined below) relating to the SSNs;
   (d)   any related security documents in respect of any liabilities under paragraphs (a) to (c) above;
   (e)   that certain 'Intercreditor Agreement' between, among others, the Existing Parent (as defined below), J.P. Morgan Europe Limited as "Super Priority Agent" and J.P. Morgan Europe Limited as Security Agent (the "Security Agent"), dated November 20, 2009 and effective as of November 27, 2009 (the "Intercreditor Agreement"); and
   (f)   any note depositary agreement, any fee letter and any indemnity letter in favor of any Senior Secured Noteholders in connection with the issue of the SSNs (but not any document to the extent it sets out rights of the initial purchasers of the SSN (in their capacities as such) against any member of the Existing Group (as defined below)).

[4] One unlimited management share and one ordinary share in each of HTIII and HTV are held by HTVI.
[5] An organizational chart of the Existing Group and its parents is attached to the Corner-Jones Declaration as Exhibit A.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

see the ultimate beneficial ownership of WIND Hellas change to the hands of the current holders of the SSNs as described below.

5.     The Petitioner is a partner in the Corporate Recovery team at Zolfo Cooper LLP specializing in cross border advisory and formal insolvency appointments as a licensed insolvency practitioner under English law.  As noted above, the Petitioner was duly appointed foreign representative pursuant to the Resolution of Appointment.  Pursuant to the Convening Court Order, the UK Court declared that the Petitioner has been specifically authorized to act as a foreign representative in respect of the UK Proceeding in restructuring-related proceedings concerning the Debtor in the United States, including in this chapter 15 case, and regarding the relief requested by this Petition.  As described in more detail below, it is anticipated that the UK Court will appoint the Petitioner as an administrator in insolvency administration proceedings in respect of the Debtor, the Existing Parent, HTIV, HTIII and HTVI to be commenced shortly after the Scheme becomes effective and in advance of the hearing to consider the relief requested hereby.

B.     **The Business of the Debtor and the Existing Group**

6.     HTV was originally formed as a société à responsabilité limitée in Luxembourg on March 25, 2005 with the name "Troy V S.à r.l." and is registered with the Registre de Commerce et des Sociétés de Luxembourg (the Luxembourg Trade and Companies Register) under the number B107289.  It changed its name to "Troy GAC Luxembourg V" on May 12, 2005, and to "Hellas Telecommunications (Luxembourg) V" on September 16, 2005.

7.     In conjunction with its May 12, 2005 name change, HTV also transformed its legal structure from a société à responsabilité limitée to a société en commandite par actions (an "SCA").  An SCA must have at least one unlimited management share to be held by the SCA's administrative organ, its general partner (typically a private limited liability company), which

4

owes duties of a fiduciary nature to the SCA. As noted above, HTVI holds HTV's management share.

8.  Like the other entities that comprise the Existing Group (but excluding WIND Hellas itself), HTV is a finance company whose business operations focus on servicing its debt. According to its corporate articles, the company's purpose is, among other things, to hold "participations, in any form whatsoever, in Luxembourg and/or foreign companies and any other form of investment, the acquisition by purchase, subscription or in any other manner as well as the transfer by sale, exchange or otherwise of securities of any kind and the administration, control and development of its portfolio."[6] Its principal function has been to raise financing for the business of WIND Hellas, which it has done through the Senior Secured Indenture and the Revolving Credit Facility (as defined and described below), the proceeds of each of which HTV loaned-on to WIND Hellas pursuant to certain corporate bond programmes. Accordingly, the only material assets of HTV are intercompany debt claims against WIND Hellas.

9.  WIND Hellas is a fully integrated telecommunications operator in Greece, offering fixed line, internet and mobile telecommunications services, including voice, network access and related value added services, to pre-paid and post-paid customers. WIND Hellas offers its services to consumers and businesses through a variety of tariff plans and pre-paid service packages. WIND Hellas is one of three operators licensed to provide GSM[7] and UMTS[8] mobile telecommunication services in Greece. As of September 30, 2010, WIND Hellas had a total

---

[6] Copies of HTV's "Constitution de Société" and re-stated "Statuts Coordonnés" (the "Articles") are attached to the Corner-Jones Declaration as Exhibit D.
[7] "Global System for Mobile Communications" (originally from "Groupe Spécial Mobile") is the most popular standard for mobile telephony systems in the world.
[8] "Universal Mobile Telecommunications Services" is also known as "3G," or "Third Generation," a generation of standards for mobile telecommunications devices.

mobile customer base of approximately 3.88 million customers and a fixed line and internet customer base of approximately 556,000 customers.

## C. Summary of the Existing Group's Capital Structure

10. As of September 30, 2010, the Existing Group had outstanding financial debt to third parties of approximately €2,074,986,214 made up as follows:

- €1,222,250,000 plus accrued interest of €48,238,770 (of which €15,682,076 is capitalized interest and €32,556,694 is regular accrued interest) borrowed by HTV under the Senior Secured Indenture, guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI, and secured by liens on in effect substantially all of the assets of the Existing Parent, WIND Hellas, HTIV, HTV and HTVI;

- €250,000,000 plus accrued interest of €1,155,616 borrowed by HTV under that certain €250,000,000 senior subscription agreement dated as of April 3, 2005 between, among others, HTV and J.P. Morgan Europe Limited, as, among other things, Agent and Security Agent, as most recently amended and restated pursuant to a supplemental agreement dated November 20, 2009 (the "Revolving Credit Facility," the debt thereunder, the "Revolving Debt," and the lenders thereunder, the "RCF Lenders") guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI and secured by first priority liens on in effect substantially all of the assets of the Existing Group;

- €355,000,000 plus accrued interest of €18,760,474 (of which €1,370,694 is capitalized interest and €17,389,780 is regular interest and accrued exit fees) under that certain amended and restated indenture dated as of October 7, 2005, as amended and restated on December 18, 2006 (and as amended and supplemented up to the date hereto) and between, among others, The Bank of New York Mellon as Trustee (the "Senior Unsecured Notes Trustee"), J.P. Morgan Europe Limited as Security Agent and HTIII as issuer (the "Senior Unsecured Indenture," the notes issued thereunder, the "Senior Unsecured Notes," and the debt thereunder, the "Senior Unsecured Debt") guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI (but not the Debtor), and, although referred to as "Senior Unsecured Indenture," secured by liens on the shares of WIND Hellas, all intercompany bond loans from HTIII and the bank accounts of HTIII; and

- €38,674,900 plus accrued interest of €155,707 under certain hedging unwind amendment agreements (the "Hedging Unwind Agreements") in respect of debt owing under interest rate swap transactions with JPMorgan Chase Bank, N.A. and Deutsche Bank A.G., London Branch as hedge counterparty creditors (together, the "Hedging Banks," and together with the RCF Lenders, the "Super Priority Lenders"); the Hedging Unwind Agreements closed out each of the interest rate swap transactions and liquidated the amounts owed by the Existing Group including the Debtor as guarantor, which are secured by first priority liens on substantially all of the assets of the Existing Group; the default interest (at 1% above the Hedging Banks' respective costs of funding) has been accruing since June 30, 2010 (such interest together with the other amounts owing under

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

the Hedging Unwind Agreements, the "Super Priority Hedging Debt," and together with the Revolving Debt, the "Super Priority Debt");

- €6,625,000.00 plus accrued interest of €47,152 owed by WIND Hellas to the National Bank of Greece under common bond loan subscription agreements (the "NBG Bond"); and

- €120,602,015 in principal plus accrued interest of €13,476,580 owed by WF3 to its parent, Weather Finance II S.à r.l ("WFII"), a société à responsabilité limitée incorporated under the laws of Luxembourg.

11.  To establish the relative rights of their creditors under certain of the above financing arrangements, the members of the Existing Group, including HTV, entered into the Intercreditor Agreement with, among others, the RCF Lenders and their agents under the Revolving Credit Facility, the Trustee, the Senior Unsecured Notes Trustee and the Security Agent. The Intercreditor Agreement sets out:

- the relative ranking of the debts owed by the Existing Parent, WIND Hellas and its subsidiaries, HTV and HTIII;

- the relevant ranking of security granted by the Existing Parent, WIND Hellas and its subsidiaries;

- when payments can and cannot be made in respect of certain debts;

- when enforcement action can and cannot be taken in respect of certain debts;

- the terms pursuant to which certain debts will be subordinated upon the occurrence of certain insolvency events;

- turnover provisions; and

- the circumstances in which security and guarantees granted by, and claims against, the Existing Group companies will be released to permit an enforcement sale.

12.  The Intercreditor Agreement provides that debt outstanding under the Revolving Credit Facility (including the guarantees thereof), the SSNs (including the guarantees thereof (the "Senior Secured Guarantees")), the Senior Unsecured Debt (including the guarantees thereof) and certain other debt of the group will rank in right and priority of payment in the following order:

7

- first, the Super Priority Debt (including the guarantees thereof), the Senior Secured Debt and debt under the Senior Secured Guarantees without any priority among them;

- second, the Senior Unsecured Debt (including the guarantees thereof); and

- third, intercompany debt (which consists of all liabilities of a member of the Existing Group to another member other than the intercompany corporate bond loans).

13. The NBG Bond debt is unsecured and not covered by the Intercreditor Agreement. There is, however, a provision in the NBG Bond which restricts WIND Hellas from granting security interests, other than security interests that were already in existence at the date of issuance of the NBG Bond debt.

14. The Intercreditor Agreement also provides that the parties' relative rights in the shared collateral rank (after the payment of certain fees, costs, expenses and liabilities incurred in connection with such enforcement and excluding, for these purposes, the rights of certain administrative agents):

- first, the Super Priority Debt (including the guarantees thereof);

- second, the Senior Secured Debt and the Senior Secured Guarantees;

- third, the Senior Unsecured Debt (including the guarantees thereof); and

- fourth, the intercompany debt, including the intercompany corporate bond loans to the extent that the relevant Intercompany Creditor (as defined in the Intercreditor Agreement) is entitled under the relevant Security Documents (as defined in the Intercreditor Agreement) to the proceeds of enforcement.

15. Clause 8.5(a) of the Intercreditor Agreement provides a mechanism by which, inter alia, in the event that a disposal of any asset (including shares in an Existing Group member) is being made to a person outside the Existing Group, the RCF Lenders may instruct the Security Agent under the Revolving Credit Facility and the Senior Secured Noteholders may instruct the Trustee to release any security interests of the parties to the Intercreditor Agreement over the relevant asset, as well as all claims of the parties to the Intercreditor Agreement under the Finance Documents (as defined in the Intercreditor Agreement) over the asset. Where the asset

8

consists of shares in an Existing Group member, such release may not include any obligations and liabilities that such member of the Existing Group or any of its subsidiaries has as a borrower to repay principal and pay interest, premium or other return on principal.

16.    Clause 8.5 also provides that, where any one of certain representatives of the secured parties has requested the disposal of shares in any member of the Existing Group to a third party, in circumstances where the RCF Lenders, the Senior Secured Noteholders and/or the Senior Unsecured Noteholders are entitled to take Enforcement Action (as defined in the Intercreditor Agreement), the Security Agent is irrevocably authorized by the RCF Lenders, the Senior Secured Noteholders and the Senior Unsecured Noteholders to release any security and claims over the relevant company/shares, provided that: (i) the consideration for the disposal is in the form of cash (or substantially all cash), (ii) a "fairness opinion" is provided in connection with the disposal by an internationally recognized investment bank which confirms that the disposal price is fair, (iii) upon completion of the disposal, the relevant company (and all of its subsidiaries) will be released from all present and future obligations under the Super Priority Debt and Senior Secured Debt, and (iv) the proceeds of the disposal are applied in accordance with the priority provisions set out in clause 9.1 of the Intercreditor Agreement.  In other words, if the RCF Lenders and/or the Senior Secured Noteholders were to request the sale of an Existing Group company, in circumstances where they were entitled to take Enforcement Action, and if an all-cash bid were to be made for such company at a price which was backed up by a fairness opinion, then, subject to satisfying the other requirements of Clause 8.5, security over and claims against the relevant company could be released without the agreement of the other creditors.

17.    In the context of the Restructuring, Clause 8.5 of the Intercreditor Agreement provides an important mechanism by which the shares in WIND Hellas and certain Existing

NEW YORK 7901866 (2K)
RLF1 3628586v. 1

Group companies' rights, interests and claims against WIND Hellas may be transferred to an incoming purchaser of the WIND Hellas Group unencumbered by existing creditors' claims over such assets.

### D.   The Debtor's Connections to the United Kingdom

18.   As a requirement of maintaining its existence under Luxembourg law, HTV is obliged to maintain and does maintain its registered office in Luxembourg at 12, rue Guillaume Kroll, L-1882 Luxembourg.[9]  However, HTV does not conduct any business or other operations at this office.  In June 2010, HTV initiated steps to permanently move the center of its main interests[10] from Luxembourg to England, moving its head office to 55 Old Broad Street, London, EC2M 1RX, on June 29, 2010, and administering its affairs from that location since that time. HTV shares workspace, a boardroom, and a dedicated fax line with the other members of the Existing Group (aside from WIND Hellas, which operates from Greece), the names of all of which are displayed in the first floor reception area.

19.   HTV is party to an agreement with Stern & Company, dated July 30, 2010, for the provision of certain corporate administration services in London, including (i) updating corporate books, drafting resolutions and making representations to relevant authorities (as requested by HTV), (ii) bookkeeping, (iii) preparing of tax returns (if requested) and (iv) corporate secretarial and treasury services.

20.   All HTV's administrative functions have been and are carried out from the London office.  All HTV's correspondence and, in particular, press releases are on HTV letterhead, which refers to its London head office address.  Third parties correspond with HTV at the London address, although some limited items of correspondence have been received at the

---

[9] The registered office in Luxembourg is provided by Weather Capital S.à r.l. pursuant to a registration agreement dated as of July 16, 2010.
[10] Center of main interests is sometimes abbreviated herein as "COMI."

NEW YORK 7901866 (2K)
RLF1 3628586v. 1

Luxembourg address of HTV since July 1, 2010, relating to, for example, auditors' invoices, telephone bills and bank statements relating to HTV's bank account in Luxembourg. All outgoing correspondence, however, is sent from the London address.

21.    Since July 22, 2010, HTV has been registered as a United Kingdom ("UK") establishment of an overseas company with Companies House, the official UK government register of UK companies.[11]  Since July 15, 2010, HTV has maintained the entirety of its statutory books, records and corporate documents, with the exception of the shareholders' register,[12] at its London address.

22.    As noted above, HTVI is the general partner and sole manager of HTV and is therefore responsible for its day-to-day management.  Pursuant to resolutions of the sole shareholder of HTVI dated July 5, 2010, Mike Corner-Jones, Scott Pinfield and Richard Hudson replaced Weather Finance I S.à r.l. on the board of managers of HTVI.  These managers are all British nationals and work and are resident in the UK and conduct HTVI's affairs, and therefore the affairs of HTV, from the UK.

23.    HTV's status as a finance company had meant that its administrative activities were minimal and routine.  The state of its affairs changed as HTV and the other members of the Existing Group began considering strategic alternatives and negotiating with creditors in response to the financial and operational difficulties described below.  Since July 12, 2010, the boards of companies of the Existing Group, including the Debtor (but excluding WIND Hellas), have held weekly meetings at their London offices with their financial advisers, Morgan Stanley, and legal advisers, White & Case (International) LLP, both of which are also working primarily

---

[11] A copy of HTV's Certificate of Registration as an Overseas Company, dated July 27, 2010, is attached to the Corner-Jones Declaration as Exhibit E.
[12] The Debtor's Luxembourg counsel has advised that the shareholders' register must remain at HTV's registered office in Luxembourg in order to satisfy Luxembourg company law requirements.

NEW YORK 7901866 (2K)
RLF1 3628586v. 1

from London on their engagements with the Existing Group.[13]  In addition, negotiations with the creditors of the Existing Group have taken place in London, and all communications by the Existing Group to advisors and creditors have originated from London.  Thus, since the administration and decision-making in respect of the Debtor's affairs has become active, such administration and decision-making has occurred in the UK.

24.  On July 1, 2010, notification of HTV's change of address and fax number was communicated to the following parties:

i.  J.P. Morgan Europe Limited, in its capacity as Agent under the Revolving Credit Facility, regarding the change of address and fax number for notices under the Revolving Credit Facility;

ii.  J.P. Morgan Europe Limited, in its capacity as Security Agent under the Intercreditor Agreement, regarding the change of address and fax number for notices under the Intercreditor Agreement;

iii.  J.P. Morgan Europe Limited, in its capacity as Bondholder Agent (as defined below), regarding the change of address and fax number for notices under the corporate bond programme finance documents;

iv.  The Bank of New York Mellon, in its capacity as trustee, regarding the change of address and fax number for notices under the Senior Secured Indenture and Senior Unsecured Indenture;

v.  Law Debenture, in its capacity as process agent under certain English law finance documents to which HTV is party; and

vi.  CT Corporation, in its capacity as process agent under certain New York law finance documents to which HTV is party.

25.  An announcement by the Existing Parent dated July 1, 2010 and entitled "WIND Hellas Group reaches agreement with creditors" was sent to the press and also posted on

---

[13] Attached as Exhibit F to the Corner-Jones Declaration is a schedule of (i) all meetings of the general partner and sole manager (as applicable) of HTV that have taken place since July 12, 2010; (ii) all key meetings with the Existing Group companies' creditors that have taken place since June 14, 2010; (iii) all meetings as between the Existing Group companies' legal advisers and the creditors' legal advisers that have taken place since June 11, 2010; and (iv) all meetings as between the Existing Group companies and their legal, financial and other advisers that have taken place since May 25, 2010.  Each of the meetings listed above took place in person in London and/or remotely via a conference line established by a London-based professional adviser.

12

the WIND Hellas website.[14] The announcement included details of the London address and the fax number in the header. On July 7, 2010, the London address and fax number were posted on the WIND Hellas website, under the section called "Investor Relations–Contact Us,"[15] as contact details for the Existing Parent, HTIII and HTV.

26. An announcement was also issued through the Luxembourg Bourse on July 1, 2010, which gave HTV's new London office address as its principal place of business and set out the fax number.

27. Apart from some minor (i) tax obligations owed to the government of Luxembourg and (ii) disputed fees in relation to audit services, the Debtor does not appear to have any other obligations to external Luxembourg creditors, except to the extent (if at all) external Luxembourg creditors are among the beneficial holders of the SSNs or the Debtor's other financial indebtedness. The Debtor also owes a relatively small amount to its Luxembourg affiliate Weather Capital S.à r.l.

28. HTV has bank accounts with the London branch of The Bank of New York Mellon and the London branch of JPMorgan Chase Bank N.A. It also continues to have a bank account with ING Luxembourg SA in Luxembourg as required by certain existing corporate finance documents, but no payments are being made, or have been made since July 2010, from the Luxembourg account, and the balance of such account is negligible. The members of the Existing Group (apart from WIND Hellas) maintain a centralized cash management system whereby payments on day-to-day expenses are made from an HTVI account with ING Bank, N.V., London branch.

---

[14]     A copy of the announcement is attached to the Corner-Jones Declaration as Exhibit G.
[15]     Now found under the section called "Investors—Contact Us." <u>See</u>
         <u>http://www.wind.com.gr/TopMenu/Επενδυτες/Επικοινωνια.aspx.</u>

29.   Pursuant to English law, HTV is now considered to be resident in the UK for tax purposes, as board meetings of HTV have taken place in the UK since July 12, 2010 and it is considered that "central management and control" of HTV is exercised by the board at such meetings.  Further, the "place of effective management" of HTV for the purposes of the UK/Luxembourg double tax treaty is also where board meetings are held, i.e. the United Kingdom.  PricewaterhouseCoopers, the tax advisors to the Existing Group, has advised that the Luxembourg tax authorities have given confirmation that, as a consequence of the relocation of HTV's effective management and control to the UK, HTV would be considered to be a tax resident in the UK in accordance with the tie-breaker rule contained in Article 4 of the double tax treaty concluded between Luxembourg and the UK.

### E.   **Connections to the United States**

30.   HTV's only asset in the United States is its reversionary interest in a $50,000 retainer advanced to the Petitioner's Delaware counsel, Richards, Layton & Finger, P.A. of Wilmington, Delaware.

31.   The Senior Secured Indenture under which the Debtor issued the SSNs is, by its terms, generally governed by New York law, Senior Secured Indenture § 13.08, but is not qualified or required to be qualified under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb, because the offer and sale of the SSNs was not registered or required to be registered under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, because the SSNs were not sold in a public offering in the United States.[16]  Pursuant to Section 13.09 of the Senior Secured Indenture, HTV has expressly consented to the jurisdiction of any federal or state court located in the Borough of Manhattan in the City of New York, New York.

---

[16] The SSNs are traded on the Euro MTF Market of the Luxembourg Bourse.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

32.  HTV has appointed CT Corporation System, 111 Eighth Avenue, 13th Floor, New York, New York as its agent for service of process from any such court for actions arising out of the Senior Secured Indenture or transactions contemplated thereby.  Some of the Senior Secured Noteholders and other financial creditors of HTV may be based in the United States.

33.  HTV is not involved in any litigation in the United States.

## F.  Recent Financial Difficulties

34.  The Existing Group has been materially and adversely impacted by the global and Greek macro-economic downturns in terms of both results of operations and financial condition. In 2009, as a result of WIND Hellas' negative financial performance from the first quarter onwards, various restructuring options for the WIND Hellas Group were considered.  A decision was made to place WIND Hellas' former owner, Hellas Telecommunications (Luxembourg) II ("HTII"), a société en commandite par actions incorporated under the laws of Luxembourg, into administration in England and Wales on November 26, 2009.  The assets of HTII (including WIND Hellas and HTIV) were sold to the Existing Parent, a separate indirect Weather subsidiary, during the administration.[17]  The administrators, as agents of HTII (in administration), concluded the sale on November 27, 2009.

35.  Since the 2009 restructuring was completed, however, the operating and macroeconomic conditions in Greece have deteriorated significantly, leading to a sharp decline in the financial performance of WIND Hellas throughout 2010.  Repositioning of the company's services and cost reductions implemented by its management since the 2009 restructuring have been unable to compensate for the decline in revenue, which further declined in April and May 2010 when austerity measures in Greece were implemented by the Greek government to address

---

[17] The administration and sale were sanctioned by Mr. Justice Lewison on November 26, 2009.  See In the matter of Hellas Telecommunications (Luxembourg) II [2009] EWHC 3199 (Ch).

NEW YORK 7901866 (2K)
RLF1 3628586v. 1

the severe fiscal problems facing that country. The imposition of the austerity measures reduced consumers' incomes and increased taxes significantly, altering consumer behavior adversely to the business interests of WIND Hellas.

36. The declining trend in WIND Hellas' revenue was also exacerbated by the competitive environment. WIND Hellas' competitors undertook aggressive initiatives to maintain or grow their market share during the economic crisis, responding to the deteriorating economic situation with multiple price reductions, leading to increased subscription acquisition and retention costs for WIND Hellas. With its leveraged capital structure, WIND Hellas' performance and liquidity was severely impacted by this adverse market and competitive environment.

37. In May 2010, the further decline in WIND Hellas' performance, coupled with management's clear view that the decline in the overall market environment was not a temporary phenomenon, led its management to revise its four-year outlook for the company and to review its forecast liquidity position, in light of its operating results, including its results for the first quarter of 2010. Management's forecast showed that WIND Hellas would have insufficient cash flow to pay interest under the intercompany finance documents between it and its subsidiaries (including the corporate bond programmes with HTV). As a consequence, it was forecast that the Existing Group would be unable to meet certain obligations falling due in July 2010, including a €17.5 million amortization payment scheduled to be paid by HTV under the Revolving Credit Facility and a €22 million interest payment due from HTV to the Senior Secured Noteholders and the Hedging Banks.

16

38.   Management reported that the first three months of 2010 had been very challenging in light of the difficult economic landscape in Greece combined with the ongoing value-destructive competitive environment.  These results highlighted the following:

(a)   a decrease of 18.5% in total revenues (€216.9 million compared to €266.1 million in the first quarter of 2009);

(b)   a decrease of 31.4% in the Existing Group's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") (€52.2 million compared to €76.1 million in the first quarter of 2009);

(c)   a significant reduction in operating expenses, following a number of decisive actions taken by management (notably, including a reduction in the number of full-time employees by 20% year-on-year between the first quarter of 2010 and the first quarter of 2009); and

(d)   a further decline in revenue trends in April and May 2010 when the austerity measures were implemented in Greece.

39.   The economic and competitive environment in Greece has continued to deteriorate since the first quarter of 2010.  This has been reflected in WIND Hellas' performance.  In its second quarter results (for the period ended June 30, 2010), WIND Hellas reported that its total revenues had declined further, to €202.3 million (a 27.5% decrease as against the second quarter of 2009).  Similarly, its EBITDA had reduced to €39.1 million (a 52.4% year-on-year decrease).  In its third quarter results (for the period ended September 30, 2010), WIND Hellas reported that total revenues had further declined to €200.8 million (a 28.8% year-on-year decrease), and its EBITDA had reduced to €54.3 million (a 44.8% year-on-year decrease).  Throughout the period, WIND Hellas' overall mobile customer numbers have declined (from a total of 4.595 million users in the first quarter of 2010 to 3.881 million users in the third quarter).

40.   The business performance of WIND Hellas declined markedly following the closing of the restructuring in November 2009, and it continues to do so.  Without decisive action to address the operating underperformance, restructure the capital structure, restore

17

adequate liquidity and restore customer and supplier confidence, WIND Hellas' management believes that the situation will continue to worsen.

### G. Steps Taken Toward Financial Restructuring

41.     The Existing Group appointed a broad range of advisers (both legal and financial) in order to develop plans and contingencies to work through its financial difficulties. It worked with certain of its advisers to prepare a valuation of the Existing Group and its business on a going concern basis and to develop a revised business plan. The valuation work indicated that there is long-term value in the business of the Existing Group as a going concern, but that in the event of a sale of the Existing Group as a going concern, only the Super Priority Lenders and the Senior Secured Noteholders would stand to make any recoveries based on the waterfall set out in the Intercreditor Agreement. The valuation work did not identify any scenarios in which the Senior Unsecured Noteholders would make any recoveries.

42.     The Existing Group commenced negotiations in London with its principal financial creditors in June 2010 regarding the terms of the Restructuring with the aim of reducing the financial pressure on the business of WIND Hellas and ensuring that WIND Hellas will operate as a going concern into the future. As part of this process, Senior Secured Noteholders holding a beneficial interest in 82.137% (principal face amount) of the SSNs, including those Senior Secured Noteholders comprising a working group (the "Senior Secured Working Group"), agreed to a standstill agreement, dated as of June 30, 2010, with the Existing Group, J.P. Morgan Europe Limited, and 79.65% of the RCF Lenders and 100% of the Hedging Banks (the "Standstill Agreement"). The Standstill Agreement became fully effective with respect to the RCF Lenders and Hedging Banks on July 1, 2010, and with respect to consenting and acceding Senior Secured Noteholders on July 20, 2010.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

43. The Standstill Agreement included, among other things, the following features:

(a) a suspension of rights by consenting creditors related to (i) the €17.5 million principal payment due to the RCF Lenders on June 30, 2010; (ii) the €14,458,986.45 interest payment due to the Senior Secured Noteholders on July 15, 2010; (iii) the €38,674,900 payment due to the Hedging Banks on June 30, 2010 pursuant to the terms of the Hedging Unwind Agreements; and (iv) any non-compliance with certain financial and other covenants during the period of the Standstill Agreement; and

(b) an undertaking by WIND Hellas and the Existing Parent to take a number of actions including, inter alia:

- provide additional financial and operational reporting and disclosure of material developments;

- comply with agreed milestones related to the implementation of a process to pursue strategic alternatives;

- appoint a chief restructuring officer by July 5, 2010; and

- work with advisors to the RCF Lenders and the Senior Secured Working Group and to pay their reasonable fees and expenses.

44. The Standstill Agreement has allowed the Existing Group to take a number of actions to materially improve its liquidity position and stabilize its capital structure while conducting a strategic review of alternatives to address its capital structure in the long term and to negotiate with key creditor constituencies toward agreeing upon and implementing lasting solutions to preserve its business as a going concern.

45. The Existing Group, working together with its advisors, marketed the WIND Hellas business and received a number of bids from outside players. Over the course of the marketing process, however, the Senior Secured Noteholders emerged as the prospective buyer.

46. Although the Standstill Agreement contemplated that the suspension of creditors' rights would remain in place only until November 5, 2010, the parties' negotiations led to the execution of a restructuring agreement (the "Restructuring Agreement"), which became effective on November 3, 2010, subject to certain termination rights, and has the effect of extending the

19

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

suspension of rights until January 20, 2011 with respect to consenting and acceding creditors. The Restructuring Agreement has been executed or acceded to by the members of the Existing Group, more than 66 2/3% of the RCF Lenders, more than 75% of the Scheme Creditors (as defined below) (including the Senior Secured Working Group), the Hedging Banks, Bidco, Holdco, the agent acting on behalf of the RCF Lenders (the "RCF Agent"), the Security Agent, the agent for the creditors under WIND Hellas' corporate bond programmes (the "Bondholder Agent").[18] The function of the Restructuring Agreement is to outline the steps the parties have agreed to take to facilitate the Restructuring, including the transfer of the shares in WIND Hellas to Bidco and to achieve a release and/or compromise of the obligations of and claims against WIND Hellas pursuant to the terms of the Existing Group's financing arrangements. Implementation of the Scheme is critical to the Restructuring, and obtaining this Court's recognition and enforcement of the Scheme, together with other related relief requested herein, is a legal condition required for the Restructuring to occur and become effective.

## H. Legal Framework for Schemes of Arrangement under the Law of England and Wales

47.  A scheme of arrangement is a proceeding under the laws of England and Wales[19] that allows companies to effect compromises or arrangements, including restructuring their liabilities, with their members and/or creditors (or any class of them). Schemes are available in the situation where a company is insolvent, but also where no grounds for insolvency exist. They are particularly useful in cases in which hold-out creditors seek unfair advantage as against similarly ranked creditors in work-out negotiations, as they enable companies and their creditors

---

[18] Representatives of certain holders of the Senior Unsecured Notes who approached the Existing Group's advisors were invited to participate in negotiations in respect of the Restructuring but have never to responded to the invitation.
[19] The legal basis for schemes of arrangement is set out in Part 26 of the Companies Act 2006 of England and Wales.

in certain instances to obtain a court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors. Creditors in general benefit from the fact that a scheme can afford the certainty that they will receive at least certain consideration in partial satisfaction of their claims relatively quickly in accordance with the terms of the scheme, although they may lose some of their rights, including the right to full satisfaction of their claims, pursuant to the "compromise" or "arrangement" proposed in the Scheme.

48. The scheme process begins when a company proposes the scheme and then submits it to the UK Court, seeking its permission to convene a creditors' meeting (or meetings) to vote on the scheme proposal, i.e., the "compromise" or "arrangement" being put to the creditors and/or members. After a hearing, at which creditors are entitled to raise objections (primarily at this stage as to the composition of creditor classes and jurisdiction issues), the UK Court decides whether to order that a creditors' meeting (or meetings) be convened to discuss and vote on the proposed scheme.

49. Any such convening order must rest on a finding of requisite jurisdiction. To have jurisdiction under English law to sanction a scheme, the UK Court must have jurisdiction to wind up the company in question under the Insolvency Act 1986. For foreign companies, this requires that there be "sufficient connection" with England and Wales. In this regard, although this test is different to that to establish a company's "center of main interest§" or "COMI," in practice the factors that the UK Court will look at to establish both are the same.

50. If the UK Court finds it has jurisdiction and decides to allow a creditors' meeting (or meetings) to be convened, notice of the meeting must be delivered to creditors directly affected by the scheme before the meeting. Such notice must set forth the time and place of the creditors' meeting, and an explanatory statement must be distributed to such creditors that

21

contains sufficient information for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether to support the scheme. The explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of an acceptance or rejection of a chapter 11 plan. Affected creditors are entitled to attend (in person or by proxy) and ask questions regarding the proposed scheme at the creditors' meeting.

51. The scheme is considered approved by the creditors' meeting only if it is supported by a simple majority (by number) of the creditors present and voting (in person or by proxy) and representing at least 75% by value of each class of creditors involved. All creditors whose claims would be affected by the scheme are entitled to vote. The voting majorities will normally be scrutinized and confirmed by an independent third party (in this case, the "Information Agent"). In those cases where the creditors have been divided into a number of classes with different rights, each class of creditors must approve the scheme by the same majorities. In this connection it should be noted that non-consenting creditors can be bound into the terms of the Scheme only if they are within an approving class. Thus, unlike a confirmed chapter 11 plan, a scheme cannot "cram down" entire classes of dissenting creditors.

52. As noted above, in order for the scheme to become binding on the creditors following the creditors' meeting or meetings (assuming the requisite majority votes in favor have been obtained) it must also be approved by the UK Court at a fairness hearing, which is comparable to a confirmation hearing under section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3020(b)(2). All affected creditors have an opportunity to raise questions and objections to the scheme and present evidence at the fairness hearing.

22

53.  The UK Court has full discretion to grant or withhold its approval of the scheme at the fairness hearing  In particular, it will examine whether the applicable statutory requirements are met, for example whether the requisite majorities of voting creditors have approved the scheme (the Information Agent providing a sworn statement as evidence thereof), and whether the scheme overall is fair, taking into account the interests of the creditors and the nature of the scheme's impact upon dissenting creditors.

54.  If the UK Court approves a scheme, it will take effect once a certified copy of the UK Court's order approving the scheme[20] has been submitted to the Registrar of Companies for England and Wales.  It will then apply to, and be effective upon, all creditors in the relevant class or classes, irrespective of whether or not they took part in the creditors' meeting or meetings and whether or not they voted in favor of the scheme.

55.  Non-UK creditors have the same rights to participate in and vote at the creditors' meetings, participate at and raise questions and issues at both UK Court hearings in relation to the scheme, and appeal the UK Court's orders, if any, as creditors from the UK.

## I.    The UK Proceeding

56.  In this case, after negotiating the terms of the Scheme and other aspects of the Restructuring as set forth in the Restructuring Agreement, the Debtor applied to the UK Court on November 4, 2010 for an order directing it to convene the meeting of the Scheme Creditors pursuant to section 896 of the Companies Act 2006 for them to consider and, if thought fit, approve the Scheme (the "Scheme Meeting").  The Scheme has only one class, consisting of persons with a beneficial interest as principal in the SSNs, held in "Global Form" through the relevant clearing systems, at the "Record Time," currently anticipated to be 12:00 noon (London

---

[20] The order may be appealed to the Court of Appeal, and appeal may be had from the Court of Appeal to the Supreme Court.

time) on Friday, December 3, 2010, three days before the proposed date for the Scheme Meeting (the "Scheme Creditors").[21]

57.   Notice of the application was delivered to all Scheme Creditors pursuant to a practice statement letter (the "Practice Statement Letter") dated and posted on the Information Agent's website[22] on October 27, 2010 and delivered as set forth below.[23]

58.   The Practice Statement Letter was addressed to The Bank of New York Mellon, in its capacity as the Trustee, and to the Scheme Creditors. It was also copied to the Information Agent and to the Senior Secured Working Group counsel, Bingham McCutchen LLP ("Bingham") (with a request that it be forwarded to their clients).[24]

59.   The Practice Statement Letter was also published and delivered to the Scheme Creditors on October 27, 2010 by:

   (a)   notification on WIND Hellas' website;

   (b)   notification through the relevant depositaries (Clearstream Banking S.A. and

---

[21] In relation to the SSNs, the Debtor has considered who satisfies the legal definition of a "creditor" of HTV for the purposes of the Scheme. While one might argue, in relation to the SSNs, that the "formal" creditor may be the Trustee alone, both HTV and the Trustee recognize that such a narrow interpretation of the term "creditor" is inappropriate in this instance because those creditors with the actual economic interest in the SSNs, i.e. the "real" creditors, are the underlying Senior Secured Noteholders, or Scheme Creditors. Moreover, the Senior Secured Indenture expressly prevents the Trustee from exercising any discretion to vote on a matter such as this. The Trustee has also advised HTV that it would be unable to vote at the Scheme Meeting without a resolution of the Senior Secured Noteholders authorizing it to do so, and that it does not currently exercise their rights.

It should also be noted that the SSNs are held in global form through depositaries. All of the beneficial interests in the SSNs are held by the Senior Secured Noteholders through account holders (the "Account Holders"), who are registered as having a direct interest in the SSNs with one of the depositaries. While the beneficial interests in the SSNs are recorded on the books of the Account Holders, the Senior Secured Noteholders are numerous and are not readily identifiable by HTV. As a result, HTV and its sole manager and general partner will not be in a position to ascertain the identities of the Scheme Creditors other than those who have come forward and identified themselves during the restructuring negotiations, nor can they identify precisely how many Scheme Creditors there are. Nevertheless, the Petitioner believes that the process described herein will ensure, to the extent possible, that all Scheme Creditors receive the relevant information in time to meaningfully exercise their rights.

[22] The Information Agent, Lucid Issuer Services Ltd., has agreed, among other things, to provide a website (www.lucid-is.com/hellas) to make Scheme documentation available to Scheme Creditors and to transmit any document to any bona fide Scheme Creditor who requests the same.

[23] A copy of the Practice Statement Letter is attached to the Corner-Jones Declaration as Exhibit H.

[24] The Senior Secured Working Group has been represented throughout the discussions relating to the Restructuring by Bingham and Moelis & Company UK LLP ("Moelis & Company"). Bingham, in particular, has negotiated the Restructuring Documents (as defined below).

24

Euroclear Bank S.A./N.V.); and

(c)    notification on the Luxembourg Bourse.

60.    The Practice Statement Letter notified the Scheme Creditors of:

(a)    the fact that the Scheme was being promoted;

(b)    the purpose that the Scheme is designed to achieve;

(c)    the fact that a meeting of Scheme Creditors was contemplated for the purposes of voting on the Scheme;

(d)    the proposed composition of the Scheme Meeting; and

(e)    the proposed date of the hearing at which the UK Court will decide whether or not to sanction the Scheme (assuming that the Scheme is approved at the Scheme Meeting by the requisite majorities) (the "Fairness Hearing").

61.    Further, the Practice Statement Letter gave notice that HTV was intending to apply to the UK Court, at a court hearing to be held no earlier than November 4, 2010, for an order (i.e., the Convening Court Order) granting HTV certain directions in relation to the Scheme, including permission to convene the Scheme Meeting.

62.    Formal notice of the November 4, 2010 hearing was provided on October 27, 2010. Given the preliminary nature of the November 4, 2010 hearing (to set future dates for the Scheme Meeting where creditors could vote on the Scheme and the Fairness Hearing and to authorize dissemination of the Scheme and related documents to creditors), that Bingham had been actively involved in negotiations in relation to the Restructuring and the key Restructuring Documents (as defined below) prior to the publication of the Practice Statement Letter (and were communicating with their clients at all times), the urgent liquidity position of the Existing Group and the impending expiry of the Standstill Agreement, the Petitioner believed that such notice was sufficient and was justified by the urgency of the situation and the need to achieve a restructuring. In this regard, the Debtor has been informed by Moelis & Company, an advisor to

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

the Senior Secured Working Group, that they have been in contact with entities who have indicated that they are holders of more than 75% of the SSNs and that none of those entities raised a concern about the timing of the November 4, 2010 hearing.

63. On November 4, 2010, the UK Court determined to hold a hearing and issued the Convening Court Order. The UK Court found that it could exercise jurisdiction and that the center of the Debtor's main interests is situated in England, based upon the Debtor's connections to the UK as described above. Among other things, the Convening Court Order also (i) sets the Scheme Meeting for 11:00 a.m. (London time) on December 6, 2010, at the offices of White & Case LLP, 5 Old Broad Street, London EC2N 1DW, UK, (ii) ordered that, at least 14 clear[25] days before the Scheme Meeting, a package of documents be published on the Information Agent's website and that notice be given on the Information Agent's website and with the Trustee and the depositaries, which package should include, among other things (a) an explanatory statement required to be provided under section 897 of the Companies Act 2006 (the "Explanatory Statement"), describing, among other things, the Scheme, the effect and risks of the Scheme, any material interests of the general partner and sole manager of HTV and the effect which the Scheme has on such interests, the Scheme voting and approval process, the other steps of the Restructuring (including a summary of the order sought by this Petition) and information about the Debtor and its business and that of the Existing Group,[26] (b) the document incorporating the Scheme,[27] (c) a form of notice of the Scheme Meeting (the "Notice of the Scheme Meeting")[28] and (d) a form of letter to be sent to depositary account holders (the "Account Holder Letter"), which allows Scheme Creditors to register details of their holdings of and certain elections with

---

[25] I.e., days between the date of publication and the day of the Scheme Meeting.
[26] The Explanatory Statement is attached to the Corner-Jones Declaration as Exhibit I.
[27] The Scheme is Part K of the Explanatory Statement.
[28] The Notice of the Scheme Meeting is Part M of the Explanatory Statement.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

respect to the voting of the SSNs in respect of the Scheme,[29] (the documents comprising (a)-(d) collectively, the "Notification Documents"), and that the Notification Documents be sent as directed by the Trustee and/or the depositaries, (iii) ordered that notice of the Scheme Meeting be advertized at least seven days' in advance thereof by placing notices in the Financial Times, The Times, and the Luxemburger Wort newspapers, (iv) ordered that the Fairness Hearing be set[30] to consider sanctioning the Scheme if it obtains requisite approval at the Creditors' Meeting, and (v) as noted above, declared that the Petitioner, or failing him, Simon Appell, also of Zolfo Cooper LLP, was authorized to act as foreign representative in respect of the UK Proceeding in any chapter 15 proceedings under the Bankruptcy Code.

64.    The information packages, including the notice of the Scheme Meeting, were also sent to the depositaries on November 5, 2010, who have (according to their usual procedures) forwarded a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

65.    It is understood that the Account Holders have been liaising with the beneficial owners of the Senior Secured Notes and/or any intermediaries who themselves hold an interest in the Senior Secured Notes on behalf of Scheme Creditors, and will collate, through the procedures established by the depositaries for the purposes of the Scheme, individual voting instructions from Account Holders on behalf of the Scheme Creditors. The votes can then be lodged by the Account Holder with the relevant depositary, together with certification of the individual Scheme Creditor's holding (as of the Record Time), and, in turn, lodged with HTV via the Information Agent.

---

[29] The Account Holder Letter is Part N of the Explanatory Statement.
[30] It is anticipated that the Fairness Hearing will occur on or about December 8, 2010.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

66. On November 4, 2010, HTV notified Scheme Creditors of the Scheme and the Scheme Meeting by placing notices with:

    (a)    the dedicated website set up by the Information Agent for Scheme Creditors;

    (b)    the WIND Hellas website;

    (c)    the depositaries; and

    (d)    the Luxembourg Bourse.

67. On November 9, 2010, HTV also notified Scheme Creditors of the Scheme and Scheme Meeting by advertising in the press, including the <u>Financial Times</u> and <u>The Times</u> in London and the <u>Luxemburger Wort</u> in Luxembourg.[31]

68. Notice of the Scheme and Scheme Meeting was accompanied by instructions on how to access the Explanatory Statement. Hard copies of the Explanatory Statement are available on request to each Scheme Creditor at the Debtor's expense.

**J.    <u>The Scheme</u>**

69. As noted above, it is intended that the Restructuring will be effected (in part) pursuant to the Scheme. Under the key provisions of the Scheme, Scheme Creditors will agree (or be deemed to agree) that the Scheme Claims will be assigned to Crystal Almond S.à r.l. ("<u>Bidco</u>," and such assignment, the "<u>Transfer</u>"), a <u>société à responsabilité limitée</u> incorporated in Luxembourg, in return for (among other things) the Scheme Creditors receiving an entitlement (such entitlement, the "<u>Scheme Share Entitlement</u>") to be issued equity shares in Largo Limited ("<u>Holdco</u>"), a limited liability company incorporated in Guernsey that wholly owns Bidco.[32] Immediately upon the Scheme and the Restructuring Documents (as defined below) becoming effective, the Scheme Creditors will, subject to receipt by the Information Agent of a validly

---

[31] Copies of these press advertisements are attached to the Corner-Jones Declaration as Exhibit J.

[32] A detailed explanation of the Scheme Share Entitlement is set forth in Appendix 2 to the Scheme.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

completed Account Holder Letter, be entitled to receive, in aggregate, ten percent (10%) of Holdco's issued share capital. The Scheme also grants HTV authority to execute and deliver the Restructuring Documents (as defined below) that will enable other parts of the Restructuring to occur on behalf of the Scheme Creditors. Among other things, in the further course of the Restructuring, Bidco will purchase the shares of WIND Hellas and certain other assets in an administration sale in the UK for €747.8 million (the "Purchase Price"). The funding sources of the Purchase Price (together with certain costs of the restructuring) are (i) a contribution from Holdco financed by the proceeds of an·additional offering (the "Additional Offering") of the remaining ninety percent (90%) of the shares of Holdco (such shares, the "Additional Shares") in the amount of €420 million (the "New Money Amount") to be underwritten by certain Scheme Creditors and to which Scheme Creditors will be entitled to subscribe for pro rata to their Scheme Claims and (ii) a loan under a short term bridge facility (the "Daylight Facility") in the amount of €357.9 million extended to Bidco that will be repaid by distributions recovered from the administration of the Existing Parent, HTV, HTIII and HTIV in respect of the Scheme Claims.

70.  The overall purposes of the Scheme and the other steps of the Restructuring are to:

- ensure that the business of WIND Hellas and the WIND Hellas Group[33] immediately following the transfer of all the shares of WIND Hellas to Bidco have a level of debt that is serviceable moving forward and to strengthen the balance sheet and capital structure of the Restructured Group (defined below);

- avoid placing certain companies within the Existing Group into liquidation prior to completion of the Restructuring, as a result of which the recoveries for Scheme Creditors and other stakeholders would likely be significantly less than if the Restructuring were to be successfully completed; and

- issue ten percent (10%) of the equity in Holdco to Scheme Creditors; following the completion of the Restructuring, Holdco will be the parent, through Bidco, of the WIND

---

[33] Ultimately, the WIND Hellas Group will consist of only WIND Hellas, as its subsidiaries will be sold pursuant to put options held and exercised by WIND Hellas as part of the Restructuring.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

Hellas Group (Holdco and its direct and indirect subsidiaries after the Transfer, the "Restructured Group"); in addition, Scheme Creditors will have the right to subscribe for the Additional Shares in Holdco in return for their pro rata share of the New Money Amount and subscribers for such Additional Shares will, in aggregate, be entitled to ninety percent (90%) of the equity in Holdco.

71. In consideration for, among other things, Scheme Creditors receiving their Scheme Share Entitlement, the Scheme Creditors will enter into a deed of covenant (the "Deed of Covenant") pursuant to the authority granted to HTV under the Scheme to execute and deliver the Restructuring Documents (as defined below).[34] The Deed of Covenant is an enforceable undertaking of the Scheme Creditors, deemed to be made by all Scheme Creditors pursuant to the Scheme, to refrain from (i) commencing or participating in proceedings (including any attempt to prove in insolvency proceedings of members of the Existing Group) against (a) the members of the Existing Group, (b) any person who is, or who has been at any time since January 1, 2010 a director, manager, general partner, officer (or equivalent) of any member of the Existing Group, in their capacity as such, (c) the advisors to the Existing Group (Alvarez & Marsal Europe LLP, Morgan Stanley & Co. International plc., White & Case (International) LLP, Kleyr Grasso Associés; and Karatzas & Partners Law Firm), (d) the Senior Secured Working Group, (e) the advisors to the Senior Secured Working Group (Moelis & Company UK LLP, Bingham McCutchen (London) LLP, Bingham McCutchen LLP, M. & P. Bernitsas Law, Offices and Elvinger, Hoss & Prussen), (f) the Security Agent, (g) the advisors to the Security Agent (Allen & Overy LLP, Allen & Overy Luxembourg, Jefferies International Limited and Koutalidis Law Firm); (h) the Bondholder Agent, (i) the Bondholder Agent's advisors (Allen & Overy LLP, Allen & Overy Luxembourg, and Koutalidis Law Firm), (j) the Trustee, (k) the Trustee's advisors (Hogan Lovells International LLP and Emmet, Marvin & Martin LLP), (l) Simon Appell, Alastair Beveridge and Stuart Mackellar, as prospective administrators of HTV,

---

[34] The Deed of Covenant is attached to the Scheme as Appendix 1.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

HTIII, HTIV and the Existing Parent, (m) the English administrators of HTV, the Existing

Parent, HTIII and HTIV, (n) Zolfo Cooper LLP, Ashurst LLP, Paul, Weiss, Rifkind, Wharton &

Garrison LLP, Molitor Avocats à la Cour, and Panagopoulos, Vainanidis, Schina, Economou

Law Firm, each in their capacity as advisors to the prospective administrators described in (l) and

the English administrators described in (m) above, (o) Bidco and (p) Holdco (collectively, the

"Protected Parties"), (ii) making claims against the Protected Parties for liability arising from or

in connection with implementation of the Scheme or the Restructuring, or (iii) from disputing the

assignment of the Scheme Claims to Bidco. The Deed of Covenant will also prevent Scheme

Creditors from procuring HTV to sue the Protected Parties in relation to any residual claims

which HTV may have.

72.    In addition, Scheme Creditors will be deemed to have entered into an agreement

that amends certain provisions of the Senior Secured Indenture (the "Senior Secured Indenture

Amendment Agreement") in respect of (i) the consents required for actions to be taken by the

Information Agent in respect of the Scheme and (ii) payment priorities.

73.    Holdco has given an undertaking to the Scheme Creditors (the "Holdco

Undertaking")[35] which provides that, among other things, it will be bound by the terms of the

Scheme and execute (and be bound by) a shareholders' agreement relating to Holdco in

substantially the form attached to the Scheme as Appendix 4 (the "Shareholders' Agreement,"

and together with the Deed of Covenant, the Senior Secured Indenture Amendment Agreement

and any other documents that HTV considers necessary to give effect to the Shareholders'

Agreement, the Deed of Covenant, the Senior Secured Indenture Amendment Agreement, the

Transfer or the Restructuring, the "Restructuring Documents") between (among others) WIND

Hellas, the holders of the Holdco Shares to be issued pursuant to the Scheme (the "Scheme

---

[35] A copy of the Holdco Undertaking is attached to the Corner-Jones Declaration as Exhibit K.

<u>Shares</u>"), the holders of Additional Shares and the trustee (the "<u>Holding Period Trustee</u>") of a trust settled to hold Scheme Shares for a period of years on behalf of Scheme Creditors not eligible to receive them.

74.    The other steps of the Restructuring are, in summary form,[36] as follows:

(a)    the filing of this chapter 15 case such that the chapter 15 hearing to recognize and grant force and effect to the Scheme will be held as soon as possible on or after the date on which the UK Court has granted the order placing the Debtor into administration;

(b)    each of the Scheme Creditors will agree that, on the date on which a sale and purchase agreement (the "<u>Sale and Purchase Agreement</u>") among the Sellers (as defined below) and Bidco is signed (such date, the "<u>Effective Date</u>"), and subject to the fulfilment of the other provisions of the Scheme, they will assign all of their right, title and interest to and in the Scheme Claims to Bidco including any beneficial interest as principal in the SSNs;

(c)    at the Fairness Hearing, HTV will seek approval for the Scheme, requesting that the order sanctioning the Scheme (the "<u>Court Order</u>") should be issued immediately;

(d)    if HTV is granted the relief it is seeking at the Fairness Hearing, it will be authorized to execute the Restructuring Documents for and on behalf of itself and the Scheme Creditors (to the extent that they are party to the relevant documents) immediately thereafter; the Restructuring Documents will, however, only become effective in accordance with the terms of the Scheme and the Restructuring Documents themselves;

(e)    each of the Scheme Creditors will irrevocably authorize HTV, from the date on which the UK Court sanctions the Scheme (the "<u>Court Order Date</u>"), to enter into, execute and deliver, on their behalf, the Deed of Covenant; the Deed of Covenant will, however, only become effective in accordance with the terms of the Scheme and Deed of Covenant themselves;

(f)    each Scheme Creditor will irrevocably authorize HTV, on the Effective Date, to instruct the depositaries to debit from that Scheme Creditor all book entry interests in relation to the SSNs held by it and to credit a custody account in Bidco's name with an interest in an equal amount;

(g)    in consideration of the foregoing, Holdco will issue an aggregate of 10% of the shares in Holdco, to be divided amongst the Scheme Creditors <u>pro rata</u> to the beneficial amount of the SSNs held by each of them (subject to the provisions of the Scheme[37]);

---

[36] A complete statement of the Restructuring Steps, as defined in the Scheme, is set forth at Clause 3.1 of the Scheme.

[37] For example, each Scheme Creditor must submit a completed "<u>Securities Confirmation Form</u>" setting forth its beneficial interest in the SSNs to receive its Scheme Share Entitlement, and Scheme Creditors must not be disqualified (e.g., under applicable securities laws) from receiving their Scheme Share Entitlement. In cases of Scheme Creditors where all these requirements have not been met, the relevant Holdco Shares will be held in trust until the requirements have been met. Eventually the Holdco Shares in trust may be sold and the proceeds distributed to the Scheme Creditor trust beneficiaries, if possible, or otherwise distributed as the trustee deems fit. <u>See generally</u> Clause 7.3 of the Scheme.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

(h) to raise the New Money Amount to enable repayment in full of the RCF Lenders and Hedging Banks, as well as to provide the Existing Group with sufficient working capital going forward, the remaining 90% of the shares in Holdco will be offered to each of the Scheme Creditors in proportion to their current holding of SSNs, on the terms of a share offering underwritten by the members of the Senior Secured Working Group;

(i) once the Scheme has been sanctioned and the Court Order has been lodged with the Registrar of Companies, HTV will notify the RCF Lenders, the Senior Secured Noteholders and the Hedging Banks, and various steps will be taken to accelerate the Existing Group's financial obligations;

(j) the acceleration steps referred to above will constitute "Enforcement Events" for the purposes of certain put options in respect of WIND Hellas' shares in HTIII, HTV, and HTVI (the "Put Options"), and will trigger instructions by the RCF Lenders and by the Trustee on behalf of the Scheme Creditors to the Security Agent under the terms of the Restructuring Agreement to enforce certain share pledges and to exercise the Put Options transferring the shares in HTIII, HTV and HTVI to WFII; the result of this action will be to transfer the relevant companies out of the Existing Group, by making them direct subsidiaries of WFII;

(k) the managers and general partners, as applicable, of the Existing Parent, HTIII, HTIV, HTV and HTVI will consider whether, pursuant to their fiduciary duties, they should apply to the UK Court to place these companies (the "Administration Companies") into an administration proceeding under English law; in this regard, the Petitioner, Stuart Mackellar, and Simon Appell of Zolfo Cooper LLP (the proposed "Administrators") have been monitoring the restructuring process since July 12, 2010, with a view to taking the appointment with the Administration Companies in the event it is determined that it is appropriate for each Administration Company to be put into administration;

(l) as soon as possible after administration orders (the "Administration Orders") have been made in respect of the Administration Companies, the RCF Agent and Trustee will instruct the Security Agent to deliver a request to the Existing Parent (in administration), HTIII (in administration), HTIV (in administration) and HTV (in administration) (together, the "Sellers") to conclude the Sale and Purchase Agreement with Bidco in respect of the sale (the "Sale") of the following assets (the "Target Assets") to Bidco:

   (i) the Existing Parent's shares in WIND Hellas;

   (ii) all of the Sellers' rights, title, benefit, interest and claims, whether past, present or future, against WIND Hellas; and

   (iii) certain debt under the corporate bond programmes (i.e., the debt owed by WIND Hellas to HTIII, HTIV and HTV);

(m) as soon as possible after the Administration Orders have been issued, a hearing in respect of the relief herein requested, in short to provide that the Scheme shall be given full force and effect in the United States and is binding on all persons subject to the jurisdiction of this Court, will, with the leave of this Court, be held;

(n) as soon as possible after the Sale and Purchase Agreement has been executed, and provided the relief requested herein has been obtained, HTV will instruct the depositaries to effect the Transfer of the Scheme Creditors' book entry interests in the SSNs to a

33

custody account in Bidco's name and the Transfer will then take place (the date on which the Transfer takes place, the "Senior Note Transfer Date");

(o)    The sale of the Target Assets to Bidco will constitute a disposal made in accordance with Clause 8.5(a) of the Intercreditor Agreement, entitling the Security Agent to release, on behalf of each "Creditor" and "Obligor", all "Transaction Security" and "Claims" under the "Finance Documents" (all as defined in the Intercreditor Agreement); accordingly, as soon as possible after the Senior Note Transfer Date, the RCF Agent and the Trustee, acting on the instructions of at least 66⅔ of the RCF Lenders and a majority of more than 75% of the Senior Secured Noteholders, will instruct the Security Agent to execute Deeds of Release (the "Deeds of Release") releasing all Transaction Security and Claims under the Finance Documents (including the claims of the Senior Unsecured Noteholders) to the extent permitted by the Intercreditor Agreement (the "Release Instructions"); the Deeds of Release will not release claims to principal and interest under debt obligations, as such releases are not permitted under Clause 8.5(a) of the Intercreditor Agreement;

(p)    as soon as possible after the delivery of the Release Instructions, the Sellers will complete the Sale and Purchase Agreement, pursuant to which Bidco will pay the Purchase Price, which will be allocated as follows:

   (i)    €300,000 will be paid to the Existing Parent, of which €250,000 will be paid in respect of the WIND Hellas shares and €50,000 in respect of certain rights of the Existing Parent;

   (ii)   €133,843,790 will be paid to HTIII, of which €133,834,837 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €8,953 in respect of certain other rights of HTIII;

   (iii)  €68,762,985 will be paid to HTIV, of which €68,758,386 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €4,599 in respect of certain other rights of HTIV; and

   (iv)   €544,893,225 will be paid to HTV, of which €544,856,777 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €36,448 in respect of certain other rights of HTV;

(q)    each of the Existing Parent, HTIII, HTIV, and HTV will request that its share of the Purchase Price related to the debts under the corporate bond programmes be paid direct to the Security Agent; the Existing Parent will also request that its share of the Purchase Price related to its shares in WIND Hellas be paid directly to the Security Agent; the consideration payable in respect of those companies' other rights shall be paid directly to the companies themselves;

(r)    as soon as possible after payment of the Purchase Price has been made, the following steps will take place:

   (i)    the Administrators and the Sellers will transfer the Target Assets to Bidco;

   (ii)   Bidco shall be registered as the holder of all of the issued shares in WIND Hellas;

   (iii)  the Security Agent will execute and deliver the Deeds of Release, releasing the security granted over the assets of WIND Hellas and the shares in WIND Hellas; and

(iv) the Security Agent shall distribute that portion of the Purchase Price relating to the debts of the Administration Companies in administration under the corporate bond programmes and the Existing Parent's shares in WIND Hellas in accordance with the payment mechanics contained in the Intercreditor Agreement – the RCF Lenders and Hedging Banks will be repaid in full from the proceeds of sale, with any remaining proceeds to be paid to the Trustee for application towards the Senior Secured Debt, which will at this point be held by Bidco and can be used to satisfy the Daylight Facility.

75.    The Restructuring steps outlined above are to occur sequentially in the order set out in the Scheme. It is important to note that in the event that one of the steps does not occur, to the extent permitted by law all other steps will then not occur, and any actions taken under or pursuant to prior steps under the Scheme shall, to the extent permissible by law, have no valid or binding legal effect.

## JURISDICTION AND VENUE

76.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the standing order of reference to bankruptcy judges dated September 9, 2001 signed by Chief Judge Sue L. Robinson. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)(P).

77.    This case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Petition for recognition of the UK Proceeding under section 1515 of the Bankruptcy Code.

78.    Venue is proper in this district. Section 1410 of title 28 of the United States Code provides as follows:

A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district —

(1) in which the debtor has its principal place of business or principal assets in the United States;

(2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

35

(3)   in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

79.   The Debtor has no place of business or litigation pending against it in the United States. The Debtor's only asset in the United States is its reversionary interest in the retainer held by the Petitioner's local Delaware counsel, Richards, Layton & Finger of Wilmington, Delaware. The Senior Secured Working Group and Petitioner agree that commencement in this District is both consistent with the interests of justice and convenient to the parties known to be likely involved in this case.

## RELIEF REQUESTED

80.   The Petitioner requests that this Court enter an order, substantially in the form of the proposed order attached hereto as Exhibit A, pursuant to sections 105(a), 1504, 1507(a), 1509(b)(2)-(3), 1515, 1517, 1520, 1521(a) and 1525(a) of the Bankruptcy Code that:

(a)   recognizes the UK Proceeding as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) and grants the Debtor all of the relief afforded to such proceedings pursuant to section 1520 of the Bankruptcy Code;

(b)   recognizes the Petitioner as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(c)   grants the Petitioner authority to examine witnesses, take evidence, and deliver information concerning the Debtor and its business, and entrusts the administration of all the Debtor's assets within the territorial jurisdiction of the United States to the Petitioner;

(d)   provides that, as of the Effective Date, the Court Order and the Scheme and Restructuring Documents are recognized, granted comity, entitled to full force and effect in the United States against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and that such terms shall be binding and fully enforceable on the Scheme Creditors, as well as their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, the "Related Parties") whether or not they actually agreed

36

to be bound by the Scheme or the Restructuring Documents or participated in the UK Proceeding;

(e) provides that, as of the Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Debtor or any Protected Party with respect to any debt cancelled, discharged or restructured under the Scheme or other Restructuring Documents and/or as a result of English law relating to the Restructuring is unenforceable in the United States, provided however, that if such debt is restructured under the Scheme, the Restructuring Documents or such law, the enforceability of such judgment is impaired by any order entered in respect of this Petition only to the extent it is inconsistent with the Scheme, the Restructuring Documents and such law;

(f) as of the Effective Date, permanently enjoins all Scheme Creditors and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset (except as expressly provided in the Scheme and Restructuring Documents) any debt cancelled, discharged or restructured under the Scheme or Restructuring Documents and/or as a result of English law relating to the Restructuring, or seeking any discovery related thereto, provided however, that if such debt is restructured under the Scheme, the Restructuring Documents and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Scheme, the Restructuring Documents and/or such law;

(g) as of the Effective Date, permanently enjoins all Scheme Creditors and Related Parties from commencing or continuing any action (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action or proceeding), including by way of counterclaim, employing any process, or performing any act, to collect, recover or offset (except as expressly provided in the Scheme and the Restructuring Documents) any debt cancelled, discharged or restructured under the Scheme, the Restructuring Documents and/or as a result of English law relating to the Restructuring, against property of the Debtor or of the Protected Parties including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial or administrative judgment, award, decree, assessment, garnishment, order or arbitration award, against the Debtor or the Protected Parties or their respective property, or any direct or indirect transferee of or successor to any property of the Debtor or of the Protected Parties, or any property of such transferee or successor, or (ii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property, provided however, that if such debt is restructured under the Scheme, the Restructuring Documents and/or such law, such injunction applies only to the extent that commencing or continuing such

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

action, employing such process or performing such act is inconsistent with the Scheme, the Restructuring Documents and/or such law;

(h)    as of the Effective Date, permanently enjoins Scheme Creditors and Related Parties from (i) transferring, relinquishing or disposing of any property of the Debtor or of the Protected Parties, or (ii) taking or continuing any act to obtain possession of, comingle, or exercise control over, such property, to the extent any such act under (i) or (ii) is inconsistent with the Scheme, the Restructuring Documents and English law relating to the Restructuring;

(i)    as of the Effective Date, permanently enjoins all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the U.S. Bankruptcy Court's jurisdiction from taking any action inconsistent with the Scheme, including, without limitation, against HTV, the Protected Parties (as that term is defined in the Deed of Covenant) or against any property of HTV or the Protected Parties;

(j)    as of the Effective Date, permanently enjoins Scheme Creditors and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), or employing any process, against the Foreign Representative (or the Petitioner personally), the Debtor, the Protected Parties, or any of their successors, assigns, agents, representatives, advisors or attorneys (collectively, the "Debtor Parties") or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken as of the Effective Date by any of the Debtor Parties in connection with this chapter 15 case or in preparing, disseminating, applying for or implementing the Scheme, the Restructuring Documents or the Court Order;

(k)    provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Scheme, the Restructuring Documents, any order entered in respect of this Petition, the chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of the immunity afforded the Petitioner as Foreign Representative pursuant to section 1510 of the Bankruptcy Code;

(l)    provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of such order; and

(m)    provides such other and further relief as the Court deems proper and just

(together, the "Relief Requested").

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

## BASES FOR RELIEF

81.    The Relief Requested is based on the provisions of chapter 15 (and certain other sections of the Bankruptcy Code) discussed in detail below.  The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "Model Law") so as to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).  Thus, "[t]he language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions."  In re Pro-Fit Intl. Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008).  See also In re British American Ins. Co. Ltd., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.[38]

### A.    Recognition of the UK Proceeding as a Foreign Main Proceeding and of the Petitioner as its Foreign Representative is Appropriate

82.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  In re Overnight and Control Commission of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y.

---

[38] The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."  House Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109-110 (2005).

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

2008). As explained below, the UK Proceeding, the Petitioner and this Petition satisfy all of the foregoing requirements.

      (i)   The UK Proceeding is a Foreign Main Proceeding

83.   The UK Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

84.   As an initial matter, the UK Proceeding comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which states as follows:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

85.   Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. See 11 U.S.C. § 101(23). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." See 11 U.S.C. § 1502(3).

86.   There should be little doubt that the UK Proceeding qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code. Section 1516(a) of the Bankruptcy Code entitles this Court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates. See 11 U.S.C. §§ 1516(a),

40

1515(b)(1). Here, the UK Court has recognized in the Convening Court Order that the Petitioner "is the appointed foreign representative authorised in these proceedings [i.e., the UK Proceeding] to act as a foreign representative of the Scheme Company [i.e., the Debtor] in any Chapter 15 Proceedings in the United States Bankruptcy Court and/or any Greek Cross-border Insolvency Proceedings in the Greek Court." Convening Court Order ¶ 20. Further, the UK Court declared that the Petitioner is authorized "to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Scheme including, for the avoidance of doubt, filing any petition or other request for relief intended to be filed under Chapter 15 of the US Bankruptcy Code and under the Greek Cross-border Insolvency Law . . . ." Id. at ¶ 21.

87.    The UK Proceeding is "collective" in the sense that it directly involves all Scheme Creditors and requires approval by a majority of the Scheme Creditors in number and representing at least three-quarters (by way of value) of the Scheme Claims for the Restructuring to proceed. The Scheme is intended to benefit creditors (according to their interests) collectively, rather than to benefit any single creditor alone.

88.    The UK Proceeding is a judicial proceeding in that it required the Convening Court Order to commence and will require the Court Order for the Scheme to be ultimately approved, each issued by the UK Court, a judicial body of the UK, which, under the Scheme, will have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme. Scheme § 15.1. Thus, the UK Court will supervise the affairs of the Debtor in connection with the Scheme.

NEW YORK 7901866 (2K)
RLF1 3628586v. 1

89.    The UK Proceeding is pending in a foreign country, England (a constituent member of the political union comprising the UK), under a law relating to adjustment of debt (i.e., Part 26 of the Companies Act 2006), for the purpose of reorganization, in this instance, the exchange of claims against the Debtor under the SSNs for equity of Holdco, a classic restructuring scenario often implemented in the pre-packaged chapter 11 plans familiar to this Court.

90.    The Scheme proposed in this case is between the Debtor and a class of creditors (the Scheme Creditors) and is therefore for "adjustment of debt." At its eighteenth session, the UNCITRAL Working Group on Insolvency Law, which oversaw the drafting of the Model Law, indicated that the term "foreign proceeding" was meant to include schemes and compositions such as the UK Proceeding:

> The proposal was made to add to [the definition of "foreign proceeding"] a reference to composition proceedings, namely, proceedings in which indebtedness was reduced while the debtor remained in control of its assets. The Working Group hesitated to add such a specific reference to composition proceedings. One view in that direction was that the broad category of "reorganization", which might be read more as an economic than as a legal term, would widely be understood as encompassing composition and other such proceedings. It was felt that adding such a specific reference to any particular form of reorganization might actually create uncertainty. Furthermore, it was observed that attempting a list of reorganization proceedings would run the risk of excluding some types of proceedings intended to be covered. While it was generally agreed that composition proceedings should be covered, the Working Group was not ready to reach a definitive decision on how best to achieve that result and deferred consideration of the matter to a later stage of its work. Possible approaches suggested included a definition of the term "reorganization" to cover the point, or a reference to it in a guide to enactment.

U.N. G.A., United Nations Commission on International Trade Law, 29th Session, Report of Working Group on Insolvency Law on the work of the eighteenth session ¶ 108 (1 December 1995) ("A/CN.9/419") (emphasis added).

91.    The Bankruptcy Code definition of "foreign proceeding" is even clearer in that it adds the non-uniform phrase "or adjustment of debt" to the words "under a law related to insolvency." 11 U.S.C. § 101(24). The legislative history indicates that the change is to

42

emphasize "that the scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in severe financial distress, so long as those proceedings also meet the other criteria of section 101(24)." House Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 118 (2005).

92.    Accordingly, schemes under English law have routinely been recognized as foreign proceedings in chapter 15 cases in the United States, see. e.g., Highlands Insurance Company (U.K.) Limited, No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); In re Gordian RunOff (UK) Ltd., f/k/a GIO (UK) Ltd., No. 06-11563 (RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); Petition of Lloyd (In re La Mutuelle du Mans Assurances IARD. U.K. Branch), No. 05-60100 (BRL), 2005 WL 3764946, (Bankr. S.D.N.Y. Dec. 7, 2005); In re Castle Holdco 4. Limited, No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); Europaische Rueckversicherungs-Gesellschaft in Zurich, Case No. 06-13061 (REG) (Bankr. S.D.N.Y. Jan. 22, 2007); see also In re Board of Dirs. of Hopewell Int'l Ins. Ltd., 238 B.R. 25, 49-50, 66-68 (Bankr. S.D.N.Y. 1999) (finding Bermudan scheme of arrangement, the court's description of which is very similar to schemes under the Companies Act 2006,  to be a "foreign proceeding" under former sections 101(23) and 304).

93.    In addition to qualifying as a "foreign proceeding" under section 101(23), the UK Proceeding qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." See 11 U.S.C. § 1502(4); see also 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests").

43

94.     The Bankruptcy Code neither defines nor provides a conclusive test for determining the location of a debtor's "center of main interests." There is a statutory presumption that a debtor's "registered office" is the center of its main interests "in the absence of evidence to the contrary," see 11 U.S.C. § 1516(c), yet the legislative history makes clear that the rule of the "registered office," i.e. "place of incorporation," is "designed to make recognition as simple and expedient as possible" in cases where the facts are not controversial rather than to establish a strong presumption. House Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 112-113 (2005). Thus, the court in In re Bear Stearns observed that

> This presumption permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful . . . . This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat. Chapter 15 changed the Model Law standard that established the presumption in 'the absence of proof to the contrary', to a presumption in 'the absence of evidence to the contrary'. The legislative history explains that the word 'proof' was changed to 'evidence' to make it clearer using United States terminology that the ultimate burden is on the foreign representative . . . . Whatever may be the proper interpretation of the EU Regulation, the Model Law and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the COMI.

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007) (original emphasis, internal citations omitted)); see also In re Tri-Continental Exchange Ltd., 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006) (similar view).

95.     A debtor's center of main interests has been held to be that location that third parties would objectively consider to be the location where the debtor is conducting the administration of its affairs. See In re British Am. Ins. Co. Ltd., 425 B.R. at 912 ("The location of a debtor's COMI should be readily ascertainable by third parties."); see also Lavie v. Ran ("Ran II"), 390 B.R. 257, 266 (Bankr. S.D. Tex. 2008) ("A debtor's centre of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties." (internal quotation marks omitted) (citing Miguel Virgos & Etienne Schmit, Report on the

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

Convention on Insolvency Proceedings (May 3, 1996) <u>available at</u>

<u>http://global.abi.org/sites/global.abi.org/files/insolvency report.pdf</u> (last visited Aug. 23, 2010));

<u>Bondi</u> v. <u>Bank of America, N.A. (In re Eurofood IFSC Ltd.),</u> Case 341/04, 2006 WL 1142304

(E.C.J. May 2, 2006) (stating that the center of a debtor's main interests must be identified based

on criteria that are: (1) objective; and (2) ascertainable by third parties and that the statutory

presumption that it be identified with the debtor's registered office could be rebutted if such

criteria allowed for the establishment that the debtor's registered office was nothing more than a

"letterbox" company not carrying out any business in the [location] in which its registered office

is situated." ); <u>In re Stanford Int'l Bank Ltd.,</u> [2010] EWCA (Civ) 137, [53]-[56] (Eng.)

(following the <u>Eurofood</u> holding that the presumption that registered office is COMI can only be

rebutted by factors that are objective and ascertainable by third parties, and noting that such

factors must be in the public domain, that a third party would learn such facts in the course of

dealing with the company and that any matters that "would need to be obtained by enquiry were

irrelevant to determining COMI").  As set forth in paragraph 81 above, in interpreting chapter 15

(in this context, a debtor's "center of main interests"), a court is to "consider its international

origin, and the need to promote an application of [chapter 15] that is consistent with the

application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.[39]  <u>See</u> <u>Tri-</u>

<u>Cont'l Exch.,</u> 349 B.R. at 633 (noting that examination of the term "center of main interests"

must include consideration of similar statutes adopted by foreign jurisdictions pursuant to section

1508; <u>Lavie</u> v. <u>Ran,</u> 406 B.R. 277, 281 (S.D. Tex. 2009) ("Likewise, statutes, cases, and

interpretive materials of the European Union are also instructive.").

---

[39] <u>See supra</u> note 38.

45

96. Some courts have held that an entity's 'principal place of business' is that entity's COMI. Tri-Cont'l Exch., 349 B.R. at 634. Two tests are commonly employed to determine a corporation's principal place of business:

> The "nerve center" test defines the principal place of business as the nerve center from which a corporation radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. Under this test, courts focus on those factors that identify the place where the corporation's overall policy originates. The other test has been labeled the "place of operations" or "locus of operations" test. There, the effort is to identify the place in which a corporation conducts its principal operations. Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized. Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be straightjacketed by the formal requirements of each test, but rather should adapt the tests to the facts of each case. A flexible approach is appropriate where the facts do not fall neatly within the parameters of either the "nerve center" or the "locus of operations" analysis.

Phoenix Four Inc. v. Strategic Resources Corp., 446 F.Supp.2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted); see also In re Tradex Swiss AG, 384 B.R. 34 (Bankr. D. Mass. 2008).

97. Under either standard – the "ascertainable by third parties" or the "nerve center" test – the Debtor's center of main interests is in the UK, based on the factors set forth below.

98. In this case, although HTV is incorporated in Luxembourg, both its "nerve center" and "locus of operations" are in the UK. Moreover, the existence of its center of main interests in the UK has been public and therefore ascertainable by creditors and third parties.

99. As noted above, the Debtor and other members of the Existing Group organized under the laws of Luxembourg opened a new head office in London in July and notified their creditors of the change of address by direct mailings and press releases. Since that time, the Debtor has:

- been registered as a foreign company and as a UK establishment of an overseas company;

- been holding board meetings and sending correspondence from London;

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

- been conducting creditor negotiations in London;

- issued a press release advertising the transfer;

- maintained its statutory books, records and corporate documents, with the exception of the shareholders' register, which by law must remain in Luxembourg, at its London address;

- contracted for corporate administration services from Stern & Company in London; and

- been managed by HTVI, its general partner and manager, from the UK.

100. For the reasons set out above, there is little doubt that most of HTV's creditors would objectively consider HTV to be conducting the administration of its affairs from England, including as a result of the notifications and announcements listed at paragraphs 24-26 above.

101. In addition, HTV's financial advisers, Morgan Stanley, and its legal advisers, White & Case (International) LLP, each work on its matters primarily from London.

102. HTV maintains its operating bank accounts with the London branch of The Bank of New York Mellon and the London branch of JPMorgan Chase Bank N.A. Though it also maintains a bank account with ING Luxembourg SA in Luxembourg, as noted above, no payments are being made from such account.

103. Moreover, apart from some minor tax obligations owed to the government of Luxembourg and some disputed amounts said to be owed in respect to audit services, the Debtor does not appear to have obligations owing to non-affiliated Luxembourg creditors, except to the extent external Luxembourg creditors happen to be among the beneficial holders of the SSNs and the Debtor's other financial indebtedness.

104. Although HTV continues to maintain its registered office in Luxembourg, it does so only because Luxembourg law requires it as a technical matter.

105. Finally, the UK Court has found in the Convening Court Order that the center of the Debtor's main interests is in England. Convening Court Order, p.1. In his judgment, Mr. Justice

47

Newey notes that the Debtor shifted its COMI to the UK "to take advantage of restructuring provisions which are available under English law," but in his view, that fact did not "detract from the effectiveness of those steps."[40]

106. While such finding was made under the Council (of the European Union) Regulation (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings,[41] the "centre of main interests" concept there was the model for the Model Law concept[42] and, in any event, constitutes a "similar statute[] adopted by [a] foreign jurisdiction[s],"[43] viz, the European Union. Under section 1508, such finding is entitled to considerable deference from, and should provide comfort to this Court, in determining that the center of the Debtors main interests is in the UK. Moreover, it is intended, that prior to the hearing to consider the relief requested herein, the UK Court will have granted HTV's application for administration under the Insolvency Act 1986 in England. As a condition to opening the administration, the UK Court will be required to make a separate determination that HTV's COMI is in England.

107. In summary, since the administration of and decision-making respecting the Debtor's affairs has become active because of the necessity of restructuring, the Debtor has conducted such administration and decision-making from the UK. Thus, the center of its main interests has been in the UK since July 2010, and the Debtor has no intention of returning its administrative or head-office functions to Luxembourg (or moving them anywhere else).

108. For all of the reasons set forth above, the UK Proceeding is, and should be recognized as, the foreign main proceeding in respect of the Debtor.

---

[40] In the matter of Hellas Telecommunications (Luxembourg) V, [2010] EWHC (Ch.) 2857, [6]. The judgment is attached to the Corner-Jones Declaration as Exhibit L.
[41] Council Regulation (EC) 1346/2000 on insolvency proceedings (OJ 2000 L 160/1).
[42] Guide ¶ 31 (noting that the Model Law concept "corresponds to the formulation in article 3 of the European Union Convention on Insolvency Proceedings [later adopted by regulation], thus building on the emerging harmonization as regards the notion of a 'main' proceeding").
[43] 11 U.S.C. § 1508.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

(ii)  The Petitioner is a Foreign Representative Who is a Person

109.  The second requirement for recognition of a foreign proceeding under section

1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a

person or body.  See 11 U.S.C. § 1517(a)(2).

110.  The term "foreign representative" is defined in section 101(24) of the Bankruptcy

Code as follows:

> [A] person or body, including a person or body appointed on an
> interim basis, authorized in a foreign proceeding to administer the
> reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

111.  Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an]

individual . . . ."  11 U.S.C. § 101(41).

112.  The Petitioner in this case is an individual who has been (1) duly appointed by the

Debtor's general partner and sole manager as foreign representative of the UK Proceeding and

(2) declared as authorized to act as the Debtor's "foreign representative" pursuant to the

Convening Court Order.  As such, he satisfies the second requirement for the entry of an order

recognizing the UK Proceeding under section 1517(a) of the Bankruptcy Code.

(iii)  The Petition Meets the Requirements of Section 1515

113.  The third and final requirement for recognition of a foreign proceeding under

section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the

requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a)(3).  Specifically,

section 1515 of the Bankruptcy Code sets forth certain procedural requirements which the

petition for recognition must meet, including evidence of the foreign proceeding.

49

114. Here, all of the requirements of section 1515 of the Bankruptcy Code have been met. First, the Debtor's chapter 15 case was duly and properly commenced by the Petitioner through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

115. Second, evidence of the existence of the UK Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code. See Exhibits B-C to the Corner-Jones Declaration (attaching true and correct copies of the Resolution of Appointment and the Convening Court Order).

116. Third, in accordance with section 1515(c) of the Bankruptcy Code, the Corner-Jones Declaration contains a statement identifying the UK Proceeding as the only foreign proceeding currently pending with respect to the Debtor. See Corner-Jones Declaration ¶ 71.

117. For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order recognizing the UK Proceeding as a foreign main proceeding is proper.

**B.      The Debtor is Entitled to the Automatic Relief under 11 U.S.C. § 1520**

118. Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, see 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioner respectfully submits that no further showing is required to the extent the Court recognizes the UK Proceeding as a foreign main proceeding.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

## C. The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring and Should be Granted

119. Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Such relief may include

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ; and
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) . . . .

Id. The Court may grant relief under section 1521(a) if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

120. Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

121. In granting discretionary relief, the court may also act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law. 11 U.S.C. § 1507(a). The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.[44] In exercising discretion to grant relief under section 1507, courts will be guided by the standards set forth in section 1507. Section 1507(b) provides that:

---

[44] H.R. Rep. No. 109-31, pt. I, 109th Cong., 1st Sess. 109 (2205).

51

## C. The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring and Should be Granted

119. Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Such relief may include

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ; and
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) . . . .

Id. The Court may grant relief under section 1521(a) if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

120. Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

121. In granting discretionary relief, the court may also act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law. 11 U.S.C. § 1507(a). The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.[44] In exercising discretion to grant relief under section 1507, courts will be guided by the standards set forth in section 1507. Section 1507(b) provides that:

---

[44] H.R. Rep. No. 109-31, pt. I, 109th Cong., 1st Sess. 109 (2205).

51

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of the debtor;
(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

122. Section 1507(b) of the Bankruptcy Code substantially incorporates the provisions of former section 304(c) of the Bankruptcy Code that courts considered in deciding whether to grant relief under former section 304.[45] Accordingly, courts have considered jurisprudence under such predecessor statute in applying section 1507 of the Bankruptcy Code. See In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009).

123. As noted above, the purpose of chapter 15 is to incorporate the Model Law into the United States bankruptcy law. Chapter 15 is designed "to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of –

(1) cooperation between—
    (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
    (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
(2) greater legal certainty for trade and investment;
(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
(4) protection and maximization of the value of the debtor's assets; and
(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

---

[45] See id.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

11 U.S.C. § 1501(a). "Consistent with section 1501, the court shall cooperate to the maximum

extent possible with a foreign court or a foreign representative, either directly or through the

trustee." 11 U.S.C. § 1525(a); see also 11 U.S.C. § 1509(b)(3) (once recognition of a foreign

proceeding is granted, the court in the United States shall grant comity or cooperation to the

foreign representative).

124. For the reasons that follow, the Petitioner urges this Court to exercise its discretion

under sections 105, 1507 and 1521 to grant the remaining Relief Requested, i.e., the Relief

Requested beyond recognition of the UK Proceeding as a foreign main proceeding (and of the

Petitioner's position as "foreign representative" in respect thereof) and the effects of such

recognition under section 1520.

     (i)   <u>Discretionary Relief Appropriate Under Section 1521</u>

125. The remaining portion of the Relief Requested, i.e., the Relief Requested that does

not flow automatically pursuant to section 1520(a) but which the Court may grant in its

discretion, is consistent with the goals of international cooperation and assistance to foreign

courts embodied in chapter 15 of the Bankruptcy Code, is a necessary and contractual

precondition to effect the Restructuring and the fair administration of the Scheme, and, if

granted, would promote all of the legislatively enumerated objectives of section 1501(a).

126. Fair and efficient administration of the Restructuring that protects all parties in

interest requires that all Scheme Creditors be bound by the terms of the Scheme and other

Restructuring Documents as approved and made effective by the UK Court and the laws of

England and Wales. As the Court of Appeals for the Second Circuit has recognized, "The

equitable and orderly distribution of a debtor's property requires assembling all claims against

the limited assets in a single proceeding; if all creditors could not be bound, a plan of

53

reorganization would fail." <u>Victrix S.S. Co., S.A.</u> v. <u>Salen Dry Cargo A.B.</u>, 825 F.2d 709, 714 (2d Cir. 1987).

127. The United States has a long history of granting comity to foreign restructuring plans. Over a hundred year ago, the Supreme Court recognized the necessity of giving effect to foreign schemes of arrangement in order to further these goals, reasoning that

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

<u>Canada S. Ry. Co.</u> v. <u>Gebhard</u>, 109 U.S. 527, 539 (1883).

128. Here, it is feared that certain Scheme Creditors or other entities may seek to obtain judgments in the United States against the Debtor, Bidco, Holdco or others involved in the Restructuring as effected by the Scheme and Restructuring Documents in order to obtain more than the pro rata treatment to which they are entitled pursuant to the terms of the Scheme. If certain Scheme Creditors are not bound by the terms of the Scheme and other Restructuring Documents, such creditors could conceivably be able to commence legal proceedings against the Debtor, Bidco, Holdco or others involved in the Restructuring that the UK Court could not effectively adjudicate, thereby requiring those entities to defend any such proceedings and depleting the resources of the restructured business and prejudice its reorganized value. The Relief Requested is required to prevent individual creditors acting to frustrate the purposes of the Scheme, the foremost of which is the fair and efficient administration of the Restructuring in order to maximize value for all creditors.

129. The Scheme is the most important in a series of steps to effect the overall Restructuring of the WIND Hellas Group. HTV's general partner and sole manager is of the

54

view that the Restructuring is in the best interests of the Existing Group, including the Debtor, and its stakeholders.

      (ii)   The Discretionary Relief Requested Meets the Standards for Injunctive Relief

     130.  To the extent the standards for injunctive relief apply in this chapter 15 case to the Relief Requested, those standards are met. Permanent injunctive relief generally is appropriate where the movant can show a likelihood of irreparable harm. Irreparable harm to an estate exists where the orderly determination of claims and the fair distribution of assets are disrupted. See Victrix, 825 F.2d at 713-14 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); see also In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); see also In re Lines, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury."); see also In re Garcia Avila, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("irreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum" (quoting Collier on Bankruptcy ¶ 304.05, at 304-21 (15th ed. Rev. 2003)).

     131.  While there are only a few reported decisions granting permanent injunctive relief to enforce foreign plans and discharges, see, e.g., Gebhard, 109 U.S. at 539 (concluding that actions brought in the United States by plaintiff bondholders who did not participate in the Canadian insolvency proceedings of the bond issuer could not be maintained, even though the bonds were payable in New York); In re Metcalfe & Mansfield Alternative Investments, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (recognizing, enforcing and granting permanent injunctive

relief in chapter 15 case in respect of foreign plan that included protection of third party releases provided under Canadian scheme); In re Ho Seok Lee, 348 B.R. 799 (Bankr. W.D. Wash. 2006) (granting permanent injunctive relief in a chapter 15 case as an "effective mechanism" to prevent creditor from seeking to recover amounts in excess of what was provided under Korean plan of reorganization); In re Bd. of Directors of Hopewell Internat'l Ins., Ltd., 238 B.R. 25 (Bankr. S.D.N.Y. 1999) (extending injunction of Bermuda court to prohibit any creditor from commencing or continuing actions or proceedings in the United States contrary to the Bermudan plan in a case under former section 304 of the Bankruptcy Code), injunctive relief similar to that requested here has been granted in many chapter 15 cases. See, e.g., Highlands Insurance Co. (U.K.) Limited, No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); In re Gordian RunOff (UK) Ltd., f/k/a GIO (UK) Ltd., No. 06-11563 (RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); In re Castle Holdco 4, Limited, No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); Europaische Rueckversicherungs-Gesellschaft in Zurich, No. 06-13061 (REG) (Bankr. S.D.N.Y. Jan. 22, 2007); Petition of Lloyd (In re La Mutuelle du Mans Assurances IARD, U.K. Branch), No. 05-60100 (BRL), 2005 WL 3764946 (Bankr. S.D.N.Y. Dec. 7, 2005).

132. If the Restructuring as contemplated by the Scheme and other Restructuring Documents is not given effect in the United States, there is a risk that dissident Scheme Creditors could bring proceedings against the Debtor, Holdco, Bidco (the transferee of the Transfer) and/or other parties protected by the Scheme and the Restructuring Documents in the United States based upon the Senior Secured Indenture's consent to jurisdiction in New York clause. Unless this Court grants the Requested Relief, irreparable harm could come to the integrity of the Scheme and the Restructuring which might ultimately lead to the liquidation of WIND Hellas, to

the detriment of its creditors and those of all members of the Existing Group, including those of the Debtor.

> (iii) <u>Granting the Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected"</u>

133. The Relief Requested under section 1521 is founded on the Congressional mandate to cooperate with foreign proceedings and foreign representatives to promote the goals of chapter 15. <u>See</u> 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."). As shown above, such relief is "appropriate" as that term is used in section 1521 because it is necessary to ensure the success of the UK Proceeding, the Scheme and the Restructuring. As noted above, however, the Court may grant such relief only if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

134. The Bankruptcy Code does not define "sufficient protection." The legislative history indicates that the prohibition was meant to apply "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." House Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).

135. In <u>Metcalfe</u> the court stated that its task in determining to grant full force and effect to a foreign proceeding was to determine whether the <u>procedures</u> used in the foreign insolvency proceeding accorded with American views of fundamental fairness.[46] 421 B.R. at 697; <u>see also</u> <u>Hopewell</u>, 238 B.R. at 56-61 (barring objections not raised before the foreign insolvency court

---

[46] A court might focus on the substance of a foreign plan to the extent it is alleged that granting relief in support of it would be manifestly contrary to the public policy of the United States. <u>See</u> 11 U.S.C. § 1506. The legislative history indicates that the "public policy" exception is narrow, applying only to the "most fundamental policies of the United States." House Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005). One court has determined, for example, that the lack of an opportunity for a jury trial is not manifestly contrary to U.S. public policy. <u>See</u> <u>In re Ephedra Prod. Liab. Litig.</u>, 349 B.R. 333 (S.D.N.Y. 2006). The Petitioner does not believe that the "public policy" exception is implicated here.

and stating, "[a]s long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it." (citations omitted)). The Metcalfe court examined the plan using the traditional standards used by American courts to analyze whether ordinary foreign judgments should be recognized and enforced, viz, whether the forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting." Metcalfe at 698 (internal citations omitted).

136. In this case, as noted above, the UK Court's exercise of jurisdiction over the Debtor and its Scheme was proper pursuant to the Part 26 of the Companies Act 2006 and the Insolvency Act 1986, the UK Court having found a "sufficient connection" with England and Wales based on the same factors relevant to determining the center of the Debtor's main interests.

137. The connections to the UK described above and cited as indicators that the UK is the country in which the Debtor maintains the center of its main interests also lead to the conclusion under United States and international norms that the UK Court's exercise of jurisdiction to adjudicate was proper. See Restatement of the Law (Third), Foreign Relations Law of the United States § 421 (1987) (setting forth "reasonableness" standard for exercise of jurisdiction to adjudicate and citing, inter alia, presence, regular conduct of business, and consent to jurisdiction as indicators of reasonable exercise of such jurisdiction by a particular country's courts over a company). Given the United States' own rather minimalist standards to establish

58

jurisdiction to adjudicate bankruptcy plenary cases based only on a debtor having property or a place of business in the United States, 11 U.S.C. § 109(a), those norms are unquestionably met here. See In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000) (bank accounts constitute property in the United States for purposes of eligibility under section 109 of the Bankruptcy Code, regardless of how much money was actually in them on the petition date).

138. As to procedural fairness, the Petitioner submits that the steps undertaken and to be undertaken before the Scheme and the Restructuring Documents can become effective sufficiently conform to American notions of due process such that this Court should grant comity to the Court Order (if issued and duly lodged with the Registrar of Companies) and to recognize and enforce the Scheme and Restructuring Documents if they become effective. As an initial matter, it should be noted that the American concept of due process is rooted in the common law tradition of England and the ancient rights developed and recognized in that country long before American independence. As such, this Court should take comfort in the fact that the Scheme will have been approved by an English court under the laws of England and Wales. See Hopewell, 238 B.R. at 66 ("[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.") (internal quotation marks and citations omitted); see also Metcalfe, 421 B.R. at 698 (quoting Hopewell).

139. Second, the specific steps followed and to be followed in the UK Proceeding as outlined above demonstrate a commitment to adequate process. Notice of the application to convene a creditors' meeting and the hearing thereon was delivered to all Scheme Creditors pursuant to the Practice Statement Letter posted on the Information Agent's website on October

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

27, 2010. The UK Court has ordered that a package of documents be published on the Information Agent's website and notice be given on such website and be delivered to the Trustee and depositaries, and as they shall direct, which package included, among other things (a) the Explanatory Statement, (b) the document incorporating the Scheme, (c) the Notice of the Scheme Meeting and (d) the Account Holder Letter. Notice was also published in the Financial Times, The Times, and the Luxemburger Wort newspapers.

140. To the extent United States creditors were not aware of the UK Proceeding, notice of this Petition and the Relief Requested herein will be (i) delivered to the Information Agent for distribution to the Scheme Creditors on or before November 17, 2010 and (ii) published in the National Edition of the Wall Street Journal on or before November 19, 2010, well in advance of the December 6, 2010 Scheme Meeting and December 8, 2010 Fairness Hearing.

141. Each of the Scheme Creditors has the opportunity to attend the creditors' meeting, ask questions and raise concerns in respect of the Scheme, and ultimately to vote against it in person or by proxy if believed to be outside the best interests of Scheme Creditors.

142. As noted above, in order for the Scheme to become binding, it must also be approved by the UK Court following the creditors' meeting (assuming the requisite majority votes in favor have been obtained) at the Fairness Hearing. All Scheme Creditors will have another opportunity to raise objections to the Scheme and submit evidence at the Fairness Hearing.

143. If the UK Court approves the Scheme, the Court Order will be appealable by Scheme Creditors.

144. United States and other non-English creditors have the same rights to participate in the UK Proceeding as English creditors.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

145. The procedures followed and to be followed regarding notice, information, voting, and opportunity to object and present evidence in the UK Proceeding are similar to those employed in chapter 11 cases in the United States.

146. In addition to the matters set forth above, the Scheme has the following features that ensure the fairness of the Scheme:

      (a)    there is only one (1) class of creditors, the Scheme Creditors;

      (b)    acceptance of the Scheme requires 75% in value and a majority in number of the Scheme Creditors;

      (c)    the rights of the Scheme Creditors are identical, and there can be no "cramdown" of a dissenting class of creditors;

      (d)    rights and priority of secured interests will be protected under the Scheme; and

      (e)    the interests of the Scheme Creditors will be applied pro rata under the Scheme, and the rights of other creditors of the Debtor will not be impaired.

147. Accordingly, the Petitioner submits that the standards required to "sufficiently protect" creditors and other parties in interest have been met, such that the Requested Relief can and should be granted.

      (iv)   Granting the Relief Requested Meets the Traditional Standards of "Comity" under Section 1507(b)

148. While satisfaction of the standards set forth in section 1521 and 1522 are sufficient to grant the discretionary portions of Relief Requested, the Petitioner submits that granting such relief meets the traditional standards of comity as continued today under section 1507(b) of the Bankruptcy Code.

149. The first factor under section 1507(b) is whether the additional assistance contemplated will reasonably assure "just treatment of all holders of claims against or interests in the debtor's property." Under former section 304(c) jurisprudence, courts uniformly held that

61

this requirement is satisfied where the foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all of the estate's creditors in one proceeding. See. e.g., The Bank of New York v. Treco (In re Treco), 240 F.3d 148, 158 (2d Cir. 2001); In re Culmer, 25 B.R. 625, 629 (Bankr. S.D.N.Y. 1992). As noted above, the Scheme Claims consist of beneficial interests under a single debt instrument, the Senior Secured Indenture. The Scheme Share Entitlements are distributed on a pro rata basis, and each Scheme Creditor has equal rights of participation in the UK Proceeding. The Debtor's other creditors' claims are not impaired by the Scheme.

150. The second enumerated factor, "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding," 11 U.S.C. § 1507(b)(2), is satisfied where creditors are given adequate notice of timing and procedures for filing claims, and that such procedure does not create any additional burdens for a foreign creditor to file a claim. See. e.g., Treco, 240 F.3d at 158; In re Petition of Hourani, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995). As set forth above, given the fact that the Debtor does not have a comprehensive schedule of the identities of the Scheme Creditors, it has taken measures reasonably calculated to effect adequate notice by delivering notice of the Scheme, the Scheme Meeting, procedures for voting, etc. to the relevant depositaries through the Information Agent for distribution to Account Holders and on to the Scheme Creditors through the regular channels by which notices are normally delivered. In addition, the Debtor has taken pains to publicize the proceedings through advertisements in major press dailies in the UK and Luxembourg and has provided a website with links to information respecting the Scheme and the UK Proceeding, making hard copies of the relevant documents available to Scheme Creditors at the Debtor's

62

expense. Non-UK Scheme Creditors and UK Scheme Creditors are treated equally, including having equal rights of participation in the Additional Offering (according to their SSNs holding).

151. Section 1507(b)(3) requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor. This consideration has little relevance here as HTV is a finance company whose sole activities comprised payment of interest on its funded debt; absent from this situation are myriad trade and other creditors which in other circumstances could give rise to preference or fraudulent transfer concerns. Under the Scheme, senior secured creditors will be paid in full in cash and the next senior creditors, the Senior Secured Noteholders, will receive pro rata the balance of value, including having equal rights of participation in the Additional Offering (according to their SSNs holding). In addition, prior to the consummation of the Restructuring, HTV will be placed in Administration, where the prohibitions against preferences and fraudulent transfers under, among others, sections 238, 239 and 423 of the Insolvency Act 1986 will apply.

152. Section 1507(b)(4) requires that the distribution of the Debtor's property substantially accords with the order of distribution available under the Bankruptcy Code. See, e.g., In re Gee, 53 B.R. 891, 904 (Bankr. S.D.N.Y. 1985); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007 (D.C. Cir. 1999) (Taiwanese distribution system was substantially in accordance with U.S. law because priority afforded to certain classes of claims as under the Bankruptcy Code). Simply put, that section merely requires that the "foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules." In re Ionica, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) (citations omitted). "Consequently, this factor does not preclude deference merely because the foreign distribution scheme subordinates or accords a lower priority to the U.S.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

creditor's claim. Rather, the distribution scheme must not be repugnant to a fundamental principle of American law, or render the claim unenforceable." Id. (internal citations omitted). The Scheme in this case provides a mechanism to effect a Restructuring that is not unlike a pre-packaged bankruptcy sale. Priority both in right of payment and in distribution of proceeds of enforcement of security interests is respected in substantially the same way it is respected under the Bankruptcy Code.

153. Section 1507 of the Bankruptcy Code requires that any determination of a request for assistance under chapter 15 be "consistent with principles of comity . . . ." 11 U.S.C. § 1507. As the House Judiciary Committee noted in its report, "comity is raised to the introductory language to make clear that it is the central concept to be addressed." H. Rep. at 109, U.S. Code Cong. & Admin. News 2005, 88, 172; see also 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, the court in the United States shall grant comity or cooperation to the foreign representative); Altas Shipping, 404 B.R. at 733 (granting comity to orders in Danish proceeding).

154. Principles of comity support the grant of the relief requested herein. Federal courts generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." See Victrix, 825 F.2d at 713 (citing Hilton v. Guyot, 159 U.S. 113, 202-03, 16 S. Ct. 139, 40 L. Ed. 95 (1895)); see also Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB, 773 F.2d 452 (2d Cir.1985); Atlas Shipping, 404 B.R. at 733. As noted above, particularly in the bankruptcy context, "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not

64

be bound, a plan of reorganization would fail." Victrix, 825 F.2d at 713-14. Other courts have similarly underscored the importance of extending comity to foreign bankruptcy proceedings. See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d. Cir. 1999); Maxwell Communications Corp., 93 F.3d at 1048; Cunard, 773 F.2d at 458. Indeed, comity should be withheld only when the recognition of foreign proceedings would be adverse to the public policy interests of the United States. See Somportex, Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3rd Cir. 1971); Cunard, 773 F.2d at 457 (citing Somportex). American courts have consistently recognized the interests of foreign countries in winding up the affairs of their own businesses. See Cunard, 773 F.2d at 458 (and cases cited therein); In re Gee, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985) ("Particularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed.") (citing Clarkson Co. v. Shaheen, 544 F.2d 624, 630 (2d Cir. 1976)). Because the Scheme is not contrary or prejudicial to the interests of creditors in the United States, the doctrine of comity supports the granting of permanent relief enforcing the Scheme under sections 1507 and 1521 of the Bankruptcy Code in this case.

155.   Accordingly, the Requested Relief should be granted pursuant to section 1507.

### NOTICE

156.   Notice of this Petition has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) the Information Agent for distribution to the Scheme Creditors, (iii) the Trustee, and (iv) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware. It is also being published in the National Edition of the Wall Street Journal. The Petitioner submits that no other or further notice need be provided.

NEWYORK 7901866 (2K)
RLF1 3628586v. 1

## NO PRIOR REQUEST

157. No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the Relief Requested herein and (ii) granting the Petitioner and Debtor such other and further relief as the Court deems proper and just.

Dated:   November 12, 2010
        Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

By: _____

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

and

WHITE & CASE LLP
Evan C. Hollander
Richard A. Graham
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Attorneys for Alastair Beveridge as
Petitioner and Foreign Representative of
Hellas Telecommunications (Luxembourg) V*

66

## VERIFICATION

ALASTAIR BEVERIDGE hereby declares:

1.    I have been appointed Foreign Representative by the general partner and sole manager of Hellas Telecommunications (Luxembourg) V and have been declared by the Chancery Division (Companies Court) of the High Court of Justice of England and Wales as authorized to commence and act in this ancillary case.

2.    I have read this Verification and the foregoing Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3.    I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: London, England
November 12, 2010

_____
ALASTAIR BEVERIDGE