## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| Hellas Telecommunications (Luxembourg) V, | ) | Case No. 10-_____ (    ) |
| | ) | |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

## DECLARATION OF MICHAEL CORNER-JONES
## PURSUANT TO 28 U.S.C. § 1746

I, Michael Corner-Jones, a Managing Director of Alvarez & Marsal Europe LLP of

1 Finsbury Circus (1st Floor), London EC2M 7EB, declare under penalty of perjury under the

laws of the United States of America that the following is true and correct:

1.      I submit this declaration (the "Declaration") in support of the Verified Petition for

Recognition of Foreign Main Proceeding and Motion for Related Relief dated November 12,

2010 (together with the Form of Voluntary Petition filed contemporaneously therewith, the

"Petition"),[1] which is to be filed contemporaneously herewith, and which seeks entry of an order

(i) recognizing the voluntary restructuring proceeding (the "UK Proceeding") concerning Hellas

Telecommunications (Luxembourg) V ("HTV," or the "Debtor") currently pending before the

Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the

"UK Court") as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (ii) granting related relief

pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief

pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a) and 1525(a) of the Bankruptcy

Code in support of the restructuring of the Debtor and certain of its affiliates under English law

---

[1] Except as otherwise indicated, capitalized terms used herein carry the meaning set forth in the Petition.

(the "Restructuring") through, among other things, a scheme of arrangement (the "Scheme"), if such Scheme is duly approved by a requisite majority of affected creditors and sanctioned by the UK Court, all in accordance with applicable English law. I make this Declaration on the basis of documentation in my possession or supplied to me and on facts and matters that are known to me or of which I have been informed by others. Where I have been informed by others, the information is true to the best of my knowledge and belief and I state the source of that information.

2.      On July 5, 2010, I was appointed Chief Restructuring Officer for Debtor and each of the entities within the Existing Group (defined below).[2] Through my role as Chief Restructuring Officer of the entities within the Existing Group, I am fully aware of, and closely involved in, all of the financial affairs and overall restructuring both of HTV specifically, and of the Existing Group and its other entities generally.

3.      In this Declaration, I deal with various matters that occurred before my involvement with the Existing Group. My knowledge of such matters is based on information provided to me by, among others, the management of WIND Hellas and the advisors to the Existing Group, including Morgan Stanley & Co. International plc. and White & Case (International) LLP.

### The Debtor, Its Corporate Group Structure, and the Foreign Representative

4.      HTV, a <u>société en commandite par actions</u> (partnership limited by shares) incorporated under the laws of Luxembourg, is the issuer of €1,222,250,000 of senior secured

---

[2] In relation to that appointment, I have been one of the three managers of Hellas Telecommunications (Luxembourg), a <u>société à responsabilité limitée</u> (private limited liability company) incorporated under the laws of Luxembourg ("<u>HTVI</u>"), which is the general partner and sole manager of HTV. Similarly, since July 5, 2010, I have been on the board of HTV's direct parent, WIND Hellas (defined below), as an independent manager, and on the board of WIND Hellas's parent, WFIII (defined below). I have also been one of two managers of HTV's affiliate, HTIV (defined below).

notes due 2012 (the "SSNs," and the holders thereof, the "Senior Secured Noteholders") pursuant to that certain amended and restated indenture dated as of October 7, 2005, as amended and restated on December 18, 2006 (and as further amended and supplemented up to the date hereof, the "Senior Secured Indenture," and the debt thereunder, the "Senior Secured Debt") and between, among others, The Bank of New York (now known as The Bank of New York Mellon) as Trustee (the "Trustee"), J.P. Morgan Europe Limited as Security Agent and HTV.  As discussed in more detail below, it is the claims arising from and evidenced by the Senior Secured Indenture and certain related documents (the "Senior Secured Note Documents,"[3] and such claims, the "Scheme Claims") that are the primary claims to be restructured through the Scheme.

5.      HTV, Hellas Telecommunications (Luxembourg) III ("HTIII"), a société en commandite par actions incorporated under the laws of Luxembourg, and HTVI are each subsidiaries of WIND Hellas Telecommunications S.A. ("WIND Hellas," and together with HTIII, HTV, and HTVI, the "WIND Hellas Group"), a société anonyme organized under the laws of Greece.

6.      WIND Hellas wholly owns each of HTVI, HTIII and HTV.[4]  WIND Hellas and its sister company, Hellas Telecommunications IV ("HTIV"), a société à responsabilité limitée

---

[3] The Senior Secured Note Documents include:

    (a)    the Senior Secured Indenture (including any guarantees contained therein);
    (b)    the SSNs;
    (c)    any guarantees of members of the Existing Group (as defined below) relating to the SSNs;
    (d)    any related security documents in respect of any liabilities under paragraphs (a) to (c) above;
    (e)    that certain 'Intercreditor Agreement' between, among others, the Existing Parent (as defined below), J.P. Morgan Europe Limited as "Super Priority Agent" and J.P. Morgan Europe Limited as Security Agent (the "Security Agent"), dated November 20, 2009 and effective as of November 27, 2009 (the "Intercreditor Agreement"); and
    (f)    any note depositary agreement, any fee letter and any indemnity letter in favor of any Senior Secured Noteholders in connection with the issue of the SSNs (but not any document to the extent it sets out rights of the initial purchasers of the SSN (in their capacities as such) against any member of the Existing Group (as defined below)).

[4] One unlimited management share and one ordinary share in each of HTIII and HTV are held by HTVI.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

incorporated under the laws of Luxembourg, are each wholly owned by Weather Finance III S.à r.l, (the "Existing Parent," and together with its direct and indirect subsidiaries, the "Existing Group"), a société à responsabilité limitée also incorporated in Luxembourg.

7.      The Existing Group is at present indirectly owned by Weather Investments S.p.A. ("Weather"), a Società per Azioni (stock corporation) incorporated under the laws of Italy.[5] The Debtor's Scheme is part of the larger Restructuring of the Existing Group that, if successful, will see the ultimate beneficial ownership of WIND Hellas change to the hands of the current holders of the SSNs as described below.

8.      Alastair Beveridge (the "Petitioner"), a partner in the Corporate Recovery team at Zolfo Cooper LLP specializing in cross border advisory and formal insolvency appointments as a licensed insolvency practitioner under English law, was duly appointed by a November 1, 2010 resolution (the "Resolution of Appointment") of the general partner and sole manager of HTV, HTVI, acting through its managers, as foreign representative for the purposes of these proceedings. Pursuant to a November 4, 2010 order (the "Convening Court Order"),[6] the UK Court declared that the Petitioner has been specifically authorized to act as a foreign representative in respect of the UK Proceeding in restructuring-related proceedings concerning the Debtor in the United States, including in this chapter 15 case, and regarding the relief requested by the Petition. As described in more detail below, it is anticipated that the UK Court will appoint the Petitioner as an administrator in insolvency administration proceedings in respect of the Debtor, the Existing Parent, HTIV, HTIII and HTVI to be commenced shortly after

---

[5] An organizational chart of the Existing Group and its parents is attached hereto as Exhibit A.
[6] True and correct copies of each of the Resolution of Appointment and the Convening Court Order are attached hereto as Exhibits B and C, respectively.

4

the Scheme becomes effective and in advance of the hearing to consider the relief requested hereby.

### The Business of the Debtor and the Existing Group

9.      HTV was originally formed as a <u>société à responsabilité limitée</u> in Luxembourg on March 25, 2005 with the name "Troy V S.à r.l." and is registered with the <u>Registre de Commerce et des Sociétés de Luxembourg</u> (the Luxembourg Trade and Companies Register) under the number B107289. It changed its name to "Troy GAC Luxembourg V" on May 12, 2005, and to "Hellas Telecommunications (Luxembourg) V" on September 16, 2005.

10.      In conjunction with its May 12, 2005 name change, HTV also transformed its legal structure from a <u>société à responsabilité limitée</u> to a <u>société en commandite par actions</u> (an "<u>SCA</u>"). An SCA must have at least one unlimited management share to be held by the SCA's administrative organ, its general partner (typically a private limited liability company), which owes duties of a fiduciary nature to the SCA. As noted above, HTVI holds HTV's management share.

11.      Like the other entities that comprise the Existing Group (but excluding WIND Hellas itself), HTV is a finance company whose business operations focus on servicing its debt. According to its corporate articles, the company's purpose is, among other things, to hold "participations, in any form whatsoever, in Luxembourg and/or foreign companies and any other form of investment, the acquisition by purchase, subscription or in any other manner as well as the transfer by sale, exchange or otherwise of securities of any kind and the administration, control and development of its portfolio."[7] Its principal function has been to raise financing for the business of WIND Hellas, which it has done through the Senior Secured Indenture and the

---

[7] Copies of HTV's "<u>Constitution de Société</u>" and re-stated "<u>Statuts Coordonnés</u>" (the "<u>Articles</u>") are attached hereto as Exhibit D.

Revolving Credit Facility (as defined and described below), the proceeds of each of which HTV loaned-on to WIND Hellas pursuant to certain corporate bond programmes. Accordingly, the only material assets of HTV are intercompany debt claims against WIND Hellas.

12.     WIND Hellas is a fully integrated telecommunications operator in Greece, offering fixed line, internet and mobile telecommunications services, including voice, network access and related value added services, to pre-paid and post-paid customers. WIND Hellas offers its services to consumers and businesses through a variety of tariff plans and pre-paid service packages. WIND Hellas is one of three operators licensed to provide GSM[8] and UMTS[9] mobile telecommunication services in Greece. As of September 30, 2010, WIND Hellas had a total mobile customer base of approximately 3.88 million customers and a fixed line and internet customer base of approximately 556,000 customers.

## Summary of the Existing Group's Capital Structure

13.     As of September 30, 2010, the Existing Group had outstanding financial debt to third parties of approximately €2,074,986,214 made up as follows:

- €1,222,250,000 plus accrued interest of €48,238,770 (of which €15,682,076 is capitalized interest and €32,556,694 is regular accrued interest) borrowed by HTV under the Senior Secured Indenture, guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI, and secured by liens on in effect substantially all of the assets of the Existing Parent, WIND Hellas, HTIV, HTV and HTVI;

- €250,000,000 plus accrued interest of €1,155,616 borrowed by HTV under that certain €250,000,000 senior subscription agreement dated as of April 3, 2005 between, among others, HTV and J.P. Morgan Europe Limited, as, among other things, Agent and Security Agent, as most recently amended and restated pursuant to a supplemental agreement dated November 20, 2009 (the "Revolving Credit Facility," the debt thereunder, the "Revolving Debt," and the lenders thereunder, the "RCF Lenders") guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI and secured by first priority liens on in effect substantially all of the assets of the Existing Group;

---

[8] "Global System for Mobile Communications" (originally from "Groupe Spécial Mobile") is the most popular standard for mobile telephony systems in the world.
[9] "Universal Mobile Telecommunications Services" is also known as "3G," or "Third Generation," a generation of standards for mobile telecommunications devices.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

- €355,000,000 plus accrued interest of €18,760,474 (of which €1,370,694 is capitalized interest and €17,389,780 is regular interest and accrued exit fees) under that certain amended and restated indenture dated as of October 7, 2005, as amended and restated on December 18, 2006 (and as amended and supplemented up to the date hereto) and between, among others, The Bank of New York Mellon as Trustee (the "<u>Senior Unsecured Notes Trustee</u>"), J.P. Morgan Europe Limited as Security Agent and HTIII as issuer (the "<u>Senior Unsecured Indenture</u>," the notes issued thereunder, the "<u>Senior Unsecured Notes</u>," and the debt thereunder, the "<u>Senior Unsecured Debt</u>") guaranteed by the Existing Parent, WIND Hellas, HTIV and HTVI (but not the Debtor), and, although referred to as "Senior Unsecured Indenture," secured by liens on the shares of WIND Hellas, all intercompany bond loans from HTIII and the bank accounts of HTIII; and

- €38,674,900 plus accrued interest of €155,707 under certain hedging unwind amendment agreements (the "<u>Hedging Unwind Agreements</u>") in respect of debt owing under interest rate swap transactions with JPMorgan Chase Bank, N.A. and Deutsche Bank A.G., London Branch as hedge counterparty creditors (together, the "<u>Hedging Banks</u>," and together with the RCF Lenders, the "<u>Super Priority Lenders</u>"); the Hedging Unwind Agreements closed out each of the interest rate swap transactions and liquidated the amounts owed by the Existing Group including the Debtor as guarantor, which are secured by first priority liens on substantially all of the assets of the Existing Group; the default interest (at 1% above the Hedging Banks' respective costs of funding) has been accruing since June 30, 2010 (such interest together with the other amounts owing under the Hedging Unwind Agreements, the "<u>Super Priority Hedging Debt</u>," and together with the Revolving Debt, the "<u>Super Priority Debt</u>");

- €6,625,000.00 plus accrued interest of €47,152 owed by WIND Hellas to the National Bank of Greece under common bond loan subscription agreements (the "<u>NBG Bond</u>"); and

- €120,602,015 in principal plus accrued interest of €13,476,580 owed by WF3 to its parent, Weather Finance II S.à r.l ("<u>WFII</u>"), a <u>société à responsabilité limitée</u> incorporated under the laws of Luxembourg.

14.    To establish the relative rights of their creditors under certain of the above financing arrangements, the members of the Existing Group, including HTV, entered into the Intercreditor Agreement with, among others, the RCF Lenders and their agents under the Revolving Credit Facility, the Trustee, the Senior Unsecured Notes Trustee and the Security Agent. The Intercreditor Agreement sets out:

- the relative ranking of the debts owed by the Existing Parent, WIND Hellas and its subsidiaries, HTV and HTIII;

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

- the relevant ranking of security granted by the Existing Parent, WIND Hellas and its subsidiaries;

- when payments can and cannot be made in respect of certain debts;

- when enforcement actions can and cannot be taken in respect of certain debts;

- the terms pursuant to which certain debts will be subordinated upon the occurrence of certain insolvency events;

- turnover provisions; and

- the circumstances in which security and guarantees granted by, and claims against, the Existing Group companies will be released to permit an enforcement sale.

15.    The Intercreditor Agreement provides that debt outstanding under the Revolving Credit Facility (including the guarantees thereof), the SSNs (including the guarantees thereof (the "Senior Secured Guarantees")), the Senior Unsecured Debt (including the guarantees thereof) and certain other debt of the group will rank in right and priority of payment in the following order:

- first, the Super Priority Debt (including the guarantees thereof), the Senior Secured Debt and debt under the Senior Secured Guarantees without any priority among them;

- second, the Senior Unsecured Debt (including the guarantees thereof); and

- third, intercompany debt (which consists of all liabilities of a member of the Existing Group to another member other than the intercompany corporate bond loans).

16.    The NBG Bond debt is unsecured and not covered by the Intercreditor Agreement.  There is, however, a provision in the NBG Bond which restricts WIND Hellas from granting security interests, other than security interests that were already in existence at the date of issuance of the NBG Bond debt.

17.    The Intercreditor Agreement also provides that the parties' relative rights in the shared collateral rank in the following order of priority (after the payment of certain fees, costs, expenses and liabilities incurred in connection with such enforcement and excluding, for these purposes, the rights of certain administrative agents):

8

- <u>first,</u> the Super Priority Debt (including the guarantees thereof);

- <u>second,</u> the Senior Secured Debt and the Senior Secured Guarantees;

- <u>third,</u> the Senior Unsecured Debt (including the guarantees thereof); and

- <u>fourth,</u> the intercompany debt, including the intercompany corporate bond loans to the extent that the relevant Intercompany Creditor (as defined in the Intercreditor Agreement), is entitled under the relevant Security Documents (as defined in the Intercreditor Agreement) to the proceeds of enforcement.

18.      Clause 8.5(a) of the Intercreditor Agreement provides a mechanism by which, <u>inter alia</u>, in the event that a disposal of any asset (including shares in an Existing Group member) is being made to a person outside the Existing Group, the RCF Lenders may instruct the Security Agent under the Revolving Credit Facility and the Senior Secured Noteholders may instruct the Trustee to release any security interests of the parties to the Intercreditor Agreement over the relevant asset, as well as all claims of the parties to the Intercreditor Agreement under the Finance Documents (as defined in the Intercreditor Agreement) over the asset. Where the asset consists of shares in an Existing Group member, such release may not include any obligations and liabilities that such member of the Existing Group or any of its subsidiaries has as a <u>borrower</u> to repay principal and pay interest, premium or other return on principal.

19.      Clause 8.5 also provides that, where any one of certain representatives of the secured parties has requested the disposal of shares in any member of the Existing Group to a third party, in circumstances where the RCF Lenders, the Senior Secured Noteholders and/or the Senior Unsecured Noteholders are entitled to take Enforcement Action (as defined in the Intercreditor Agreement), the Security Agent is irrevocably authorized by the RCF Lenders, the Senior Secured Noteholders and the Senior Unsecured Noteholders to release any security and claims over the relevant company/shares, provided that:  (i) the consideration for the disposal is in the form of cash (or substantially all cash), (ii) a "fairness opinion" is provided in connection

NEW YORK 7928515 (2K)
RLF1 3628585v. 1

with the disposal by an internationally recognized investment bank which confirms that the disposal price is fair, (iii) upon completion of the disposal, the relevant company (and all of its subsidiaries) will be released from all present and future obligations under the Super Priority Debt and Senior Secured Debt, and (iv) the proceeds of the disposal are applied in accordance with the priority provisions set out in clause 9.1 of the Intercreditor Agreement. In other words, if the RCF Lenders and/or the Senior Secured Noteholders were to request the sale of an Existing Group company, in circumstances where they were entitled to take Enforcement Action, and if an all-cash bid were to be made for such company at a price which was backed up by a fairness opinion, then, subject to satisfying the other requirements of Clause 8.5, security over and claims against the relevant company could be released without the agreement of the other creditors.

20. In the context of the Restructuring, Clause 8.5 of the Intercreditor Agreement provides an important mechanism by which the shares in WIND Hellas and certain Existing Group companies' rights, interests and claims against WIND Hellas may be transferred to an incoming purchaser of the WIND Hellas Group unencumbered by existing creditors' claims over such assets.

## The Debtor's Connections to the United Kingdom

21. As a requirement of maintaining its existence under Luxembourg law, HTV is obliged to maintain and does maintain its registered office in Luxembourg at 12, rue Guillaume Kroll, L-1882 Luxembourg.[10] However, HTV does not conduct any business or other operations at this office. In June 2010, HTV initiated steps to permanently move the center of its main interests[11] from Luxembourg to England, moving its head office to 55 Old Broad Street, London, EC2M 1RX, on June 29, 2010, and administering its affairs from that location since that time.

---

[10] The registered office in Luxembourg is provided by Weather Capital S.à r.l. pursuant to a registration agreement dated as of July 16, 2010.

[11] Center of main interests is sometimes abbreviated herein as "COMI."

10

HTV shares workspace, a boardroom, and a dedicated fax line with the other members of the Existing Group (aside from WIND Hellas, which operates from Greece), the names of all of which are displayed in the first floor reception area.

22.    HTV is party to an agreement with Stern & Company, dated July 30, 2010, for the provision of certain corporate administration services in London, including (i) updating corporate books, drafting resolutions and making representations to relevant authorities (as requested by HTV), (ii) bookkeeping, (iii) preparing of tax returns (if requested) and (iv) corporate secretarial and treasury services.

23.    All HTV's administrative functions have been and are carried out from the London office.  All HTV's correspondence and, in particular, press releases are on HTV letterhead, which refers to its London head office address.  Third parties correspond with HTV at the London address, although some limited items of correspondence have been received at the Luxembourg address of HTV since July 1, 2010, relating to, for example, auditors' invoices, telephone bills and bank statements relating to HTV's bank account in Luxembourg.  All outgoing correspondence, however, is sent from the London address.

24.    Since July 22, 2010, HTV has been registered as a United Kingdom ("UK") establishment of an overseas company with Companies House, the official UK government register of UK companies.[12]  Since July 15, 2010, HTV has maintained the entirety of its statutory books, records and corporate documents, with the exception of the shareholders' register,[13] at its London address.

25.    As noted above, HTVI is the general partner and sole manager of HTV and is

---

[12] A copy of HTV's Certificate of Registration as an Overseas Company, dated July 27, 2010, is attached hereto as Exhibit E.

[13] The Debtor's Luxembourg counsel has advised that the shareholders' register must remain at HTV's registered office in Luxembourg in order to satisfy Luxembourg company law requirements.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

therefore responsible for its day-to-day management. Pursuant to resolutions of the sole shareholder of HTVI dated July 5, 2010, Scott Pinfield, Richard Hudson and I replaced Weather Finance I S.à r.l. on the board of managers of HTVI. These managers are all British nationals and work and are resident in the UK and conduct HTVI's affairs, and therefore the affairs of HTV, from the UK.

26.     HTV's status as a finance company had meant that its administrative activities were minimal and routine. The state of its affairs changed as HTV and the other members of the Existing Group began considering strategic alternatives and negotiating with creditors in response to the financial and operational difficulties described below. Since July 12, 2010, the boards of companies of the Existing Group, including the Debtor (but excluding WIND Hellas), have held weekly meetings at their London offices with their financial advisers, Morgan Stanley, and legal advisers, White & Case (International) LLP, both of which are also working primarily from London on their engagements with the Existing Group.[14] In addition, negotiations with the creditors of the Existing Group have taken place in London, and all communications by the Existing Group to advisors and creditors have originated from London. Thus, since the administration and decision-making in respect of the Debtor's affairs has become active, such administration and decision-making has occurred in the UK.

27.     On July 1, 2010, notification of HTV's change of address and fax number was communicated to the following parties:

        i.     J.P. Morgan Europe Limited, in its capacity as Agent under the Revolving Credit Facility, regarding the change of address and fax number for notices

---

[14] Attached as Exhibit F hereto is a schedule of (i) all meetings of the general partner and sole manager (as applicable) of HTV that have taken place since July 12, 2010; (ii) all key meetings with the Existing Group companies' creditors that have taken place since June 14, 2010; (iii) all meetings as between the Existing Group companies' legal advisers and the creditors' legal advisers that have taken place since June 11, 2010; and (iv) all meetings as between the Existing Group companies and their legal, financial and other advisers that have taken place since May 25, 2010. Each of the meetings listed above took place in person in London and/or remotely via a conference line established by a London-based professional adviser.

under the Revolving Credit Facility;

ii.    J.P. Morgan Europe Limited, in its capacity as Security Agent under the Intercreditor Agreement, regarding the change of address and fax number for notices under the Intercreditor Agreement;

iii.    J.P. Morgan Europe Limited, in its capacity as Bondholder Agent (as defined below), regarding the change of address and fax number for notices under the corporate bond programme finance documents;

iv.    The Bank of New York Mellon, in its capacity as trustee, regarding the change of address and fax number for notices under the Senior Secured Indenture and Senior Unsecured Indenture;

v.    Law Debenture, in its capacity as process agent under certain English law finance documents to which HTV is party; and

vi.    CT Corporation, in its capacity as process agent under certain New York law finance documents to which HTV is party.

28.    An announcement by the Existing Parent dated July 1, 2010 and entitled "WIND Hellas Group reaches agreement with creditors" was sent to the press and also posted on the WIND Hellas website.[15] The announcement included details of the London address and the fax number in the header. On July 7, 2010, the London address and fax number were posted on the WIND Hellas website, under the section called "Investor Relations–Contact Us,"[16] as contact details for the Existing Parent, HTIII and HTV.

29.    An announcement was also issued through the Luxembourg Bourse on July 1, 2010, which gave HTV's new London office address as its principal place of business and set out the fax number.

30.    Apart from some minor (i) tax obligations owed to the government of Luxembourg and (ii) disputed fees in relation to audit services, the Debtor does not appear to have any other obligations to external Luxembourg creditors, except to the extent (if at all)

---

[15] A copy of the announcement is attached hereto as Exhibit G.
[16] Now found under the section called "Investors—Contact Us." See http://www.wind.com.gr/TopMenu/Επενδυτες/Επικοινωνια.aspx.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

external Luxembourg creditors are among the beneficial holders of the SSNs or the Debtor's other financial indebtedness. The Debtor also owes a relatively small amount to its Luxembourg affiliate Weather Capital S.à r.l.

31.     HTV has bank accounts with the London branch of The Bank of New York Mellon and the London branch of JPMorgan Chase Bank N.A. It also continues to have a bank account with ING Luxembourg SA in Luxembourg as required by certain existing finance documents, but no payments are being made, or have been made since July 2010, from the Luxembourg account, and the balance of such account is negligible. The members of the Existing Group (apart from WIND Hellas) maintain a centralized cash management system whereby payments on day-to-day expenses are made from an HTVI account with ING Bank, N.V., London branch.

32.     Pursuant to English law, HTV is now considered to be resident in the UK for tax purposes, as board meetings of HTV have taken place in the UK since July 12, 2010 and it is considered that "central management and control" of HTV is exercised by the board at such meetings. Further, the "place of effective management" of HTV for the purposes of the UK/Luxembourg double tax treaty is also where board meetings are held, i.e. the United Kingdom. PricewaterhouseCoopers, the tax advisors to the Existing Group, has advised that the Luxembourg tax authorities have given confirmation that, as a consequence of the relocation of HTV's effective management and control to the UK, HTV would be considered to be a tax resident in the UK in accordance with the tie-breaker rule contained in Article 4 of the double tax treaty concluded between Luxembourg and the UK.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

**Connections to the United States**

33.     The Debtor has no place of business or litigation pending against it in the United States.  HTV's only asset in the United States is its reversionary interest in a $50,000 retainer advanced to the Petitioner's Delaware counsel, Richards, Layton & Finger, P.A. of Wilmington, Delaware.

34.     The Senior Secured Indenture under which the Debtor issued the SSNs is, by its terms, generally governed by New York law, Senior Secured Indenture § 13.08, but is not qualified or required to be qualified under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb, because the offer and sale of the SSNs was not registered or required to be registered under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, because the SSNs were not sold in a public offering in the United States.[17]  Pursuant to Section 13.09 of the Senior Secured Indenture, HTV has expressly consented to the jurisdiction of any federal or state court located in the Borough of Manhattan in the City of New York, New York.

35.     HTV has appointed CT Corporation System, 111 Eighth Avenue, 13th Floor, New York, New York as its agent for service of process from any such court for actions arising out of the Senior Secured Indenture or transactions contemplated thereby.  Some of the Senior Secured Noteholders and other financial creditors of HTV may be based in the United States.

36.     HTV is not involved in any litigation in the United States.

**Recent Financial Difficulties**

37.     The Existing Group has been materially and adversely impacted by the global and Greek macro-economic downturns in terms of both results of operations and financial condition.  In 2009, as a result of WIND Hellas' negative financial performance from the first quarter

---

[17] The SSNs are traded on the Euro MTF Market of the Luxembourg Bourse.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

onwards, various restructuring options for the WIND Hellas Group were considered. A decision was made to place WIND Hellas' former owner, Hellas Telecommunications (Luxembourg) II ("HTII"), a société en commandite par actions incorporated under the laws of Luxembourg, into administration in England and Wales on November 26, 2009. The assets of HTII (including WIND Hellas and HTIV) were sold to the Existing Parent, a separate indirect Weather subsidiary, during the administration.[18] The administrators, as agents of HTII (in administration), concluded the sale on November 27, 2009.

38. Since the 2009 restructuring was completed, however, the operating and macroeconomic conditions in Greece have deteriorated significantly, leading to a sharp decline in the financial performance of WIND Hellas throughout 2010. Repositioning of the company's services and cost reductions implemented by its management since the 2009 restructuring have been unable to compensate for the decline in revenue, which further declined in April and May 2010 when austerity measures in Greece were implemented by the Greek government to address the severe fiscal problems facing that country. The imposition of the austerity measures reduced consumers' incomes and increased taxes significantly, altering consumer behavior adversely to the business interests of WIND Hellas.

39. The declining trend in WIND Hellas' revenue was also exacerbated by the competitive environment. WIND Hellas' competitors undertook aggressive initiatives to maintain or grow their market share during the economic crisis, responding to the deteriorating economic situation with multiple price reductions, leading to increased subscription acquisition and retention costs for WIND Hellas. With its leveraged capital structure, WIND Hellas'

---

[18] The administration and sale were sanctioned by Mr. Justice Lewison on November 26, 2009. See In the matter of Hellas Telecommunications (Luxembourg) II [2009] EWHC 3199 (Ch).

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

performance and liquidity was severely impacted by this adverse market and competitive environment.

40.     In May 2010, the further decline in WIND Hellas' performance, coupled with management's clear view that the decline in the overall market environment was not a temporary phenomenon, led its management to revise its four-year outlook for the company and to review its forecast liquidity position, in light of its operating results, including its results for the first quarter of 2010. Management's forecast showed that WIND Hellas would have insufficient cash flow to pay interest under the intercompany finance documents between it and its subsidiaries (including the corporate bond programmes with HTV). As a consequence, it was forecast that the Existing Group would be unable to meet certain obligations falling due in July 2010, including a €17.5 million amortization payment scheduled to be paid by HTV under the Revolving Credit Facility and a €22 million interest payment due from HTV to the Senior Secured Noteholders and the Hedging Banks

41.     Management reported that the first three months of 2010 had been very challenging in light of the difficult economic landscape in Greece combined with the ongoing value-destructive competitive environment. These results highlighted the following:

(a)     a decrease of 18.5% in total revenues (€216.9 million compared to €266.1 million in the first quarter of 2009);

(b)     a decrease of 31.4% in the Existing Group's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") (€52.2 million compared to €76.1 million in the first quarter of 2009);

(c)     a significant reduction in operating expenses, following a number of decisive actions taken by management (notably, including a reduction in the number of full-time employees by 20% year-on-year between the first quarter of 2010 and the first quarter of 2009); and

(d)     a further decline in revenue trends in April and May 2010 when the austerity measures were implemented in Greece.

NEW YORK 7928515 (2K)
RLF1 3628585v. 1

42.     The economic and competitive environment in Greece has continued to deteriorate since the first quarter of 2010.    This has been reflected in WIND Hellas' performance.   In its second quarter results (for the period ended June 30, 2010), WIND Hellas reported that its total revenues had declined further, to €202.3 million (a 27.5% decrease as against the second quarter of 2009).    Similarly, its EBITDA had reduced to €39.1 million (a 52.4% year-on-year decrease).   In its third quarter results (for the period ended September 30, 2010), WIND Hellas reported that total revenues had further declined to €200.8 million (a 28.8% year-on-year decrease), and its EBITDA had reduced to €54.3 million (a 44.8% year-on-year decrease).    Throughout the period, WIND Hellas' overall mobile customer numbers have declined (from a total of 4.595 million users in the first quarter of 2010 to 3.881 million users in the third quarter).

43.     The business performance of WIND Hellas declined markedly following the closing of the restructuring in November 2009, and it continues to do so.   Without decisive action to address the operating underperformance, restructure the capital structure, restore adequate liquidity and restore customer and supplier confidence, WIND Hellas' management believes that the situation will continue to worsen.

## Steps Taken Toward Financial Restructuring

44.     The Existing Group appointed a broad range of advisers (both legal and financial) in order to develop plans and contingencies to work through its financial difficulties.   It worked with certain of its advisers to prepare a valuation of the Existing Group and its business on a going concern basis and to develop a revised business plan. The valuation work indicated that there is long-term value in the business of the Existing Group as a going concern, but that in the event of a sale of the Existing Group as a going concern, only the Super Priority Lenders and the

18

Senior Secured Noteholders would stand to make any recoveries based on the waterfall set out in the Intercreditor Agreement. The valuation work did not identify any scenarios in which the Senior Unsecured Noteholders would make any recoveries.

45.     The Existing Group commenced negotiations in London with its principal financial creditors in June 2010 regarding the terms of the Restructuring with the aim of reducing the financial pressure on the business of WIND Hellas and ensuring that WIND Hellas will operate as a going concern into the future. As part of this process, Senior Secured Noteholders holding a beneficial interest in 82.137% (principal face amount) of the SSNs, including those Senior Secured Noteholders comprising a working group (the "Senior Secured Working Group"), agreed to a standstill agreement, dated as of June 30, 2010, with the Existing Group, J.P. Morgan Europe Limited, and 79.65% of the RCF Lenders and 100% of the Hedging Banks (the "Standstill Agreement"). The Standstill Agreement became fully effective with respect to the RCF Lenders and Hedging Banks on July 1, 2010, and with respect to consenting and acceding Senior Secured Noteholders on July 20, 2010.

46.     The Standstill Agreement included, among other things, the following features:

(a)     a suspension of rights by consenting creditors related to (i) the €17.5 million principal payment due to the RCF Lenders on June 30, 2010; (ii) the €14,458,986.45 interest payment due to the Senior Secured Noteholders on July 15, 2010; (iii) the €38,674,900 payment due to the Hedging Banks on June 30, 2010 pursuant to the terms of the Hedging Unwind Agreements; and (iv) any non-compliance with certain financial and other covenants during the period of the Standstill Agreement; and

(b)     an undertaking by WIND Hellas and the Existing Parent to take a number of actions including, inter alia:

- provide additional financial and operational reporting and disclosure of material developments;

- comply with agreed milestones related to the implementation of a process to pursue strategic alternatives;

19

- appoint a chief restructuring officer by July 5, 2010; and

- work with advisors to the RCF Lenders and the Senior Secured Working Group and to pay their reasonable fees and expenses.

47.    The Standstill Agreement has allowed the Existing Group to take a number of actions to materially improve its liquidity position and stabilize its capital structure while conducting a strategic review of alternatives to address its capital structure in the long term and to negotiate with key creditor constituencies toward agreeing upon and implementing lasting solutions to preserve its business as a going concern.

48.    The Existing Group, working together with its advisors, marketed the WIND Hellas business and received a number of bids from outside players.  Over the course of the marketing process, however, the Senior Secured Noteholders emerged as the prospective buyer.

49.    Although the Standstill Agreement contemplated that the suspension of creditors' rights would remain in place only until November 5, 2010, the parties' negotiations led to the execution of a restructuring agreement (the "Restructuring Agreement"), which became effective on November 3, 2010, subject to certain termination rights, and has the effect of extending the suspension of rights until January 20, 2011 with respect to consenting and acceding creditors. The Restructuring Agreement has been executed or acceded to by the members of the Existing Group, more than 66 2/3% of the RCF Lenders, more than 75% of the Scheme Creditors (as defined below) (including the Senior Secured Working Group), the Hedging Banks, Bidco, Holdco, the agent acting on behalf of the RCF Lenders (the "RCF Agent"), the Security Agent, the agent for the creditors under WIND Hellas' corporate bond programmes (the "Bondholder Agent").[19]  The function of the Restructuring Agreement is to outline the steps the parties have

---

[19] Representatives of certain holders of the Senior Unsecured Notes who approached the Existing Group's advisors were invited to participate in negotiations in respect of the Restructuring but have never to responded to the invitation.

agreed to take to facilitate the Restructuring, including the transfer of the shares in WIND Hellas to Bidco and to achieve a release and/or compromise of the obligations of and claims against WIND Hellas pursuant to the terms of the Existing Group's financing arrangements. Implementation of the Scheme is critical to the Restructuring, and obtaining this Court's recognition and enforcement of the Scheme, together with other related relief requested herein, is a legal condition required for the Restructuring to occur and become effective.

### The UK Proceeding

50.    After negotiating the terms of the Scheme and other aspects of the Restructuring as set forth in the Restructuring Agreement, the Debtor applied to the UK Court on November 4, 2010 for an order directing it to convene the meeting of the Scheme Creditors pursuant to section 896 of the Companies Act 2006 for them to consider and, if thought fit, approve the Scheme (the "Scheme Meeting"). The Scheme has only one class, consisting of persons with a beneficial interest as principal in the SSNs, held in "Global Form" through the relevant clearing systems, at the "Record Time," currently anticipated to be 12:00 noon (London time) on Friday, December 3, 2010, three days before the proposed date for the Scheme Meeting (the "Scheme Creditors").[20]

---

[20] In relation to the SSNs, the Debtor has considered who satisfies the legal definition of a "creditor" of HTV for the purposes of the Scheme. While one might argue, in relation to the SSNs, that the "formal" creditor may be the Trustee alone, both HTV and the Trustee recognize that such a narrow interpretation of the term "creditor" is inappropriate in this instance because those creditors with the actual economic interest in the SSNs, i.e. the "real" creditors, are the underlying Senior Secured Noteholders, or Scheme Creditors. Moreover, the Senior Secured Indenture expressly prevents the Trustee from exercising any discretion to vote on a matter such as this. The Trustee has also advised HTV that it would be unable to vote at the Scheme Meeting without a resolution of the Senior Secured Noteholders authorizing it to do so, and that it does not currently intend to vote.

It should also be noted that the SSNs are held in global form through depositaries. All of the beneficial interests in the SSNs are held by the Senior Secured Noteholders through account holders (the "Account Holders"), who are registered as having a direct interest in the SSNs with one of the depositaries. While the beneficial interests in the SSNs are recorded on the books of the Account Holders, the Senior Secured Noteholders are numerous and are not readily identifiable by HTV. As a result, HTV and its sole manager and general partner will not be in a position to ascertain the identities of the Scheme Creditors other than those who have come forward and identified themselves during the restructuring negotiations, nor can they identify precisely how many Scheme Creditors there are. Nevertheless, the Petitioner believes that the process described herein will ensure, to the extent possible, that all Scheme Creditors receive the relevant information in time to meaningfully exercise their rights.

21

51.     Notice of the application was delivered to all Scheme Creditors pursuant to a practice statement letter (the "Practice Statement Letter") dated and posted on the website of Lucid Issuer Services Ltd. (the "Information Agent")[21] on October 27, 2010 and delivered as set forth below.[22]

52.     The Practice Statement Letter was addressed to The Bank of New York Mellon, in its capacity as the Trustee, and to the Scheme Creditors. It was also copied to the Information Agent and to the Senior Secured Working Group counsel, Bingham McCutchen LLP ("Bingham") (with a request that it be forwarded to their clients).[23]

53.     The Practice Statement Letter was also published and delivered to the Scheme Creditors on October 27, 2010 by:

(a)     notification on WIND Hellas' website;

(b)     notification through the relevant depositaries (Clearstream Banking S.A. and Euroclear Bank S.A./N.V.); and

(c)     notification on the Luxembourg Bourse.

54.     The Practice Statement Letter notified the Scheme Creditors of:

(a)     the fact that the Scheme was being promoted;

(b)     the purpose that the Scheme is designed to achieve;

(c)     the fact that a meeting of Scheme Creditors was contemplated for the purposes of voting on the Scheme;

(d)     the proposed composition of the Scheme Meeting; and

(e)     the proposed date of the hearing at which the UK Court will decide whether or not to sanction the Scheme (assuming that the Scheme is approved at the Scheme

---

[21] The Information Agent has agreed, among other things, to provide a website (www.lucid-is.com/hellas) to make Scheme documentation available to Scheme Creditors and to transmit any document to any bona fide Scheme Creditor who requests the same.

[22] A copy of the Practice Statement Letter is attached hereto as Exhibit H.

[23] The Senior Secured Working Group has been represented throughout the discussions relating to the Restructuring by Bingham and Moelis & Company UK LLP ("Moelis & Company"). Bingham, in particular, has negotiated the Restructuring Documents (as defined below).

Meeting by the requisite majorities) (the "Fairness Hearing").

55.    Further, the Practice Statement Letter gave notice that HTV was intending to apply to the UK Court, at a court hearing to be held no earlier than November 4, 2010, for an order (i.e., the Convening Court Order) granting HTV certain directions in relation to the Scheme, including permission to convene the Scheme Meeting.

56.    Formal notice of the November 4, 2010 hearing was provided on October 27, 2010. Given the preliminary nature of the November 4, 2010 hearing (to set future dates for the Scheme Meeting where creditors could vote on the Scheme and the Fairness Hearing and to authorize dissemination of the Scheme and related documents to creditors), that Bingham had been actively involved in negotiations in relation to the Restructuring and the key Restructuring Documents (as defined below) prior to the publication of the Practice Statement Letter (and were communicating with their clients at all times), the urgent liquidity position of the Existing Group and the impending expiry of the Standstill Agreement, the Petitioner believed that such notice was sufficient and was justified by the urgency of the situation and the need to achieve a restructuring. In this regard, the Debtor has been informed by Moelis & Company, an advisor to the Senior Secured Working Group, that they have been in contact with entities who have indicated that they are holders of more than 75% of the SSNs and that none of those entities raised a concern about the timing of the November 4, 2010 hearing.

57.    On November 4, 2010, the UK Court determined to hold a hearing and issued the Convening Court Order. The UK Court found that it could exercise jurisdiction and that the center of the Debtor's main interests is situated in England, based upon the Debtor's connections to the UK as described above. Among other things, the Convening Court Order also (i) sets the Scheme Meeting for 11:00 a.m. (London time) on December 6, 2010, at the offices of White &

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

Case LLP, 5 Old Broad Street, London EC2N 1DW, UK, (ii) ordered that, at least 14 clear[24] days before the Scheme Meeting, a package of documents be published on the Information Agent's website and that notice be given on the Information Agent's website and with the Trustee and the depositaries, which package should include, among other things (a) an explanatory statement required to be provided under section 897 of the Companies Act 2006 (the "Explanatory Statement"), describing, among other things, the Scheme, the effect and risks of the Scheme, any material interests of the general partner and sole manager of HTV and the effect which the Scheme has on such interests, the Scheme voting and approval process, the other steps of the Restructuring (including a summary of the order sought by the Petition) and information about the Debtor and its business and that of the Existing Group,[25] (b) the document incorporating the Scheme,[26] (c) a form of notice of the Scheme Meeting (the "Notice of the Scheme Meeting")[27] and (d) a form of letter to be sent to depositary account holders (the "Account Holder Letter"), which allows Scheme Creditors to register details of their holdings of and certain elections with respect to the voting of the SSNs in respect of the Scheme,[28] (the documents comprising (a)-(d) collectively, the "Notification Documents"), and that the Notification Documents be sent as directed by the Trustee and/or the depositaries, (iii) ordered that notice of the Scheme Meeting be advertized at least seven days' in advance thereof by placing notices in the Financial Times, The Times, and the Luxemburger Wort newspapers, (iv) ordered that the Fairness Hearing be set[29] to consider sanctioning the Scheme if it obtains requisite approval at the Creditors' Meeting, and (v) as noted above, declared that the Petitioner, or failing him, Simon Appell, also of Zolfo

---

[24] I.e., days between the date of publication and the day of the Scheme Meeting.
[25] The Explanatory Statement is attached hereto as Exhibit I.
[26] The Scheme is Part K of the Explanatory Statement.
[27] The Notice of the Scheme Meeting is Part M of the Explanatory Statement.
[28] The Account Holder Letter is Part N of the Explanatory Statement.
[29] It is anticipated that the Fairness Hearing will occur on or about December 8, 2010.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

Cooper LLP, was authorized to act as foreign representative in respect of the UK Proceeding in any chapter 15 proceedings under the Bankruptcy Code.

58.     The information packages, including the notice of the Scheme Meeting, were also sent to the depositaries on November 5, 2010, who have (according to their usual procedures) forwarded a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

59.     It is understood that the Account Holders have been liaising with the beneficial owners of the Senior Secured Notes and/or any intermediaries who themselves hold an interest in the Senior Secured Notes on behalf of Scheme Creditors, and will collate, through the procedures established by the depositaries for the purposes of the Scheme, individual voting instructions from Account Holders on behalf of the Scheme Creditors. The votes can then be lodged by the Account Holder with the relevant depositary, together with certification of the individual Scheme Creditor's holding (as of the Record Time), and, in turn, lodged with HTV via the Information Agent.

60.     On November 4, 2010, HTV notified Scheme Creditors of the Scheme and the Scheme Meeting by placing notices with:

(a)     the dedicated website set up by the Information Agent for Scheme Creditors;

(b)     the WIND Hellas website;

(c)     the depositaries; and

(d)     the Luxembourg Bourse.

25

61.     On November 9, 2010, HTV also notified Scheme Creditors of the Scheme and Scheme Meeting by advertising in the press, including the Financial Times and The Times in London and the Luxemburger Wort in Luxembourg.[30]

62.     Notice of the Scheme and Scheme Meeting was accompanied by instructions on how to access the Explanatory Statement.   Hard copies of the Explanatory Statement are available on request to each Scheme Creditor at the Debtor's expense.

### The Scheme

63.     As noted above, it is intended that the Restructuring will be effected (in part) pursuant to the Scheme.   Under the key provisions of the Scheme, Scheme Creditors will agree (or be deemed to agree) that the Scheme Claims will be assigned to Crystal Almond S.à r.l. ("Bidco," and such assignment, the "Transfer"), a société à responsabilité limitée incorporated in Luxembourg, in return for (among other things) the Scheme Creditors receiving an entitlement (such entitlement, the "Scheme Share Entitlement") to be issued equity shares in Largo Limited ("Holdco"), a limited liability company incorporated in Guernsey that wholly owns Bidco.[31] Immediately upon the Scheme and the Restructuring Documents (as defined below) becoming effective, the Scheme Creditors will, subject to receipt by the Information Agent of a validly completed Account Holder Letter, be entitled to receive, in aggregate, ten percent (10%) of Holdco's issued share capital.   The Scheme also grants HTV authority to execute and deliver the Restructuring Documents (as defined below) that will enable other parts of the Restructuring to occur on behalf of the Scheme Creditors.   Among other things, in the further course of the Restructuring, Bidco will purchase the shares of WIND Hellas and certain other assets in an administration sale in the UK for €747.8 million (the "Purchase Price").   The funding sources of

---

[30] Copies of these press advertisements are attached hereto as Exhibit J.

[31] A detailed explanation of the Scheme Share Entitlement is set forth in Appendix 2 to the Scheme.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

the Purchase Price (together with certain costs of the restructuring) are (i) a contribution from Holdco financed by the proceeds of an additional offering (the "Additional Offering") of the remaining ninety percent (90%) of the shares of Holdco (such shares, the "Additional Shares") in the amount of €420 million (the "New Money Amount") to be underwritten by certain Scheme Creditors and to which Scheme Creditors will be entitled to subscribe for pro rata to their Scheme Claims and (ii) a loan under a short term bridge facility (the "Daylight Facility") in the amount of €357.9 million extended to Bidco that will be repaid by distributions recovered from the administration of the Existing Parent, HTV, HTIII and HTIV in respect of the Scheme Claims.

64. The overall purposes of the Scheme and the other steps of the Restructuring are to:

- ensure that the business of WIND Hellas and the WIND Hellas Group[32] immediately following the transfer of all the shares of WIND Hellas to Bidco have a level of debt that is serviceable moving forward and to strengthen the balance sheet and capital structure of the Restructured Group (defined below);

- avoid placing certain companies within the Existing Group into liquidation prior to completion of the Restructuring, as a result of which the recoveries for Scheme Creditors and other stakeholders would likely be significantly less than if the Restructuring were to be successfully completed; and

- issue ten percent (10%) of the equity in Holdco to Scheme Creditors; following the completion of the Restructuring, Holdco will be the parent, through Bidco, of the WIND Hellas Group (Holdco and its direct and indirect subsidiaries after the Transfer, the "Restructured Group"); in addition, Scheme Creditors will have the right to subscribe for the Additional Shares in Holdco in return for their pro rata share of the New Money Amount and subscribers for such Additional Shares will, in aggregate, be entitled to ninety percent (90%) of the equity in Holdco.

65. In consideration for, among other things, Scheme Creditors receiving their

Scheme Share Entitlement, the Scheme Creditors will enter into a deed of covenant (the "Deed

---

[32] Ultimately, the WIND Hellas Group will consist of only WIND Hellas, as its subsidiaries will be sold pursuant to put options held and exercised by WIND Hellas as part of the Restructuring.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

of Covenant") pursuant to the authority granted to HTV under the Scheme to execute and deliver the Restructuring Documents (as defined below).[33] The Deed of Covenant is an enforceable undertaking of the Scheme Creditors, deemed to be made by all Scheme Creditors pursuant to the Scheme, to refrain from (i) commencing or participating in proceedings (including any attempt to prove in insolvency proceedings of members of the Existing Group) against (a) the members of the Existing Group, (b) any person who is, or who has been at any time since January 1, 2010 a director, manager, general partner, officer (or equivalent) of any member of the Existing Group, in their capacity as such, (c) the advisors to the Existing Group (Alvarez & Marsal Europe LLP, Morgan Stanley & Co. International plc., White & Case (International) LLP, Kleyr Grasso Associés; and Karatzas & Partners Law Firm), (d) the Senior Secured Working Group, (e) the advisors to the Senior Secured Working Group (Moelis & Company UK LLP, Bingham McCutchen (London) LLP, Bingham McCutchen LLP, M. & P. Bernitsas Law, Offices and Elvinger, Hoss & Prussen), (f) the Security Agent, (g) the advisors to the Security Agent (Allen & Overy LLP, Allen & Overy Luxembourg, Jefferies International Limited and Koutalidis Law Firm); (h) the Bondholder Agent, (i) the Bondholder Agent's advisors (Allen & Overy LLP, Allen & Overy Luxembourg, and Koutalidis Law Firm), (j) the Trustee, (k) the Trustee's advisors (Hogan Lovells International LLP and Emmet, Marvin & Martin LLP), (l) Simon Appell, Alastair Beveridge and Stuart Mackellar, as prospective administrators of HTV, HTIII, HTIV and the Existing Parent, (m) the English administrators of HTV, the Existing Parent, HTIII and HTIV, (n) Zolfo Cooper LLP, Ashurst LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Molitor Avocats à la Cour, and Panagopoulos, Vainanidis, Schina, Economou Law Firm, each in their capacity as advisors to the prospective administrators described in (l) and the English administrators described in (m) above, (o) Bidco and (p) Holdco (collectively, the

---

[33] The Deed of Covenant is attached to the Scheme as Appendix 1.

"Protected Parties"), (ii) making claims against the Protected Parties for liability arising from or in connection with implementation of the Scheme or the Restructuring, or (iii) from disputing the assignment of the Scheme Claims to Bidco. The Deed of Covenant will also prevent Scheme Creditors from procuring HTV to sue the Protected Parties in relation to any residual claims which HTV may have.

66.    In addition, Scheme Creditors will be deemed to have entered into an agreement that amends certain provisions of the Senior Secured Indenture (the "Senior Secured Indenture Amendment Agreement") in respect of (i) the consents required for actions to be taken by the Information Agent in respect of the Scheme and (ii) payment priorities.

67.    Holdco has given an undertaking to the Scheme Creditors (the "Holdco Undertaking")[34] which provides that, among other things, it will be bound by the terms of the Scheme and execute (and be bound by) a shareholders' agreement relating to Holdco in substantially the form attached to the Scheme as Appendix 4 (the "Shareholders' Agreement," and together with the Deed of Covenant, the Senior Secured Indenture Amendment Agreement and any other documents that HTV considers necessary to give effect to the Shareholders' Agreement, the Deed of Covenant, the Senior Secured Indenture Amendment Agreement, the Transfer or the Restructuring, the "Restructuring Documents") between (among others) WIND Hellas, the holders of the Holdco Shares to be issued pursuant to the Scheme (the "Scheme Shares"), the holders of Additional Shares and the trustee (the "Holding Period Trustee") of a trust settled to hold Scheme Shares for a period of years on behalf of Scheme Creditors not eligible to receive them.

---

[34] A copy of the Holdco Undertaking is attached hereto as Exhibit K.

68.     The other steps of the Restructuring are, in summary form,[35] as follows:

(a)     the filing of this chapter 15 case such that the chapter 15 hearing to recognize and grant force and effect to the Scheme will be held as soon as possible on or after the date on which the UK Court has granted the order placing the Debtor into administration;

(b)     each of the Scheme Creditors will agree that, on the date on which a sale and purchase agreement (the "Sale and Purchase Agreement") among the Sellers (as defined below) and Bidco is signed (such date, the "Effective Date"), and subject to the fulfilment of the other provisions of the Scheme, they will assign all of their right, title and interest to and in the Scheme Claims to Bidco including any beneficial interest as principal in the SSNs;

(c)     at the Fairness Hearing, HTV will seek approval for the Scheme, requesting that the order sanctioning the Scheme (the "Court Order") should be issued immediately;

(d)     if HTV is granted the relief it is seeking at the Fairness Hearing, it will be authorized to execute the Restructuring Documents for and on behalf of itself and the Scheme Creditors (to the extent that they are party to the relevant documents) immediately thereafter; the Restructuring Documents will, however, only become effective in accordance with the terms of the Scheme and the Restructuring Documents themselves;

(e)     each of the Scheme Creditors will irrevocably authorize HTV, from the date on which the UK Court sanctions the Scheme (the "Court Order Date"), to enter into, execute and deliver, on their behalf, the Deed of Covenant; the Deed of Covenant will, however, only become effective in accordance with the terms of the Scheme and Deed of Covenant themselves;

(f)     each Scheme Creditor will irrevocably authorize HTV, on the Effective Date, to instruct the depositaries to debit from that Scheme Creditor all book entry interests in relation to the SSNs held by it and to credit a custody account in Bidco's name with an interest in an equal amount;

(g)     in consideration of the foregoing, Holdco will issue an aggregate of 10% of the shares in Holdco, to be divided amongst the Scheme Creditors pro rata to the beneficial amount of the SSNs held by each of them (subject to the provisions of the Scheme[36]);

(h)     to raise the New Money Amount to enable repayment in full of the RCF Lenders and Hedging Banks, as well as to provide the Existing Group with sufficient working capital going forward, the remaining 90% of the shares in Holdco will be offered to each of the Scheme Creditors in proportion to their current holding of SSNs, on the terms of a share offering underwritten by the members of the Senior Secured Working Group;

(i)     once the Scheme has been sanctioned and the Court Order has been lodged with the Registrar of Companies, HTV will notify the RCF Lenders, the Senior Secured

---

[35] A complete statement of the Restructuring Steps, as defined in the Scheme, is set forth at Clause 3.1 of the Scheme.

[36] For example, each Scheme Creditor must submit a completed "Securities Confirmation Form" setting forth its beneficial interest in the SSNs to receive its Scheme Share Entitlement, and Scheme Creditors must not be disqualified (e.g., under applicable securities laws) from receiving their Scheme Share Entitlement. In cases of Scheme Creditors where all these requirements have not been met, the relevant Holdco Shares will be held in trust until the requirements have been met. Eventually the Holdco Shares in trust may be sold and the proceeds distributed to the Scheme Creditor trust beneficiaries, if possible, or otherwise distributed as the trustee deems fit. See generally Clause 7.3 of the Scheme.

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

Noteholders and the Hedging Banks, and various steps will be taken to accelerate the Existing Group's financial obligations;

(j)    the acceleration steps referred to above will constitute "Enforcement Events" for the purposes of certain put options in respect of WIND Hellas' shares in HTIII, HTV, and HTVI (the "Put Options"), and will trigger instructions by the RCF Lenders and by the Trustee on behalf of the Scheme Creditors to the Security Agent under the terms of the Restructuring Agreement to enforce certain share pledges and to exercise the Put Options transferring the shares in HTIII, HTV and HTVI to WFII; the result of this action will be to transfer the relevant companies out of the Existing Group, by making them direct subsidiaries of WFII;

(k)    the managers and general partners, as applicable, of the Existing Parent, HTIII, HTIV, HTV and HTVI will consider whether, pursuant to their fiduciary duties, they should apply to the UK Court to place these companies (the "Administration Companies") into an administration proceeding under English law; in this regard, the Petitioner, Stuart Mackellar, and Simon Appell of Zolfo Cooper LLP (the proposed "Administrators") have been monitoring the restructuring process since July 12, 2010, with a view to taking the appointment with the Administration Companies in the event it is determined that it is appropriate for each Administration Company to be put into administration;

(l)    as soon as possible after administration orders (the "Administration Orders") have been made in respect of the Administration Companies, the RCF Agent and Trustee will instruct the Security Agent to deliver a request to the Existing Parent (in administration), HTIII (in administration), HTIV (in administration) and HTV (in administration) (together, the "Sellers") to conclude the Sale and Purchase Agreement with Bidco in respect of the sale (the "Sale") of the following assets (the "Target Assets") to Bidco:

(i)    the Existing Parent's shares in WIND Hellas;

(ii)    all of the Sellers' rights, title, benefit, interest and claims, whether past, present or future, against WIND Hellas; and

(iii)    certain debt under the corporate bond programmes (i.e., the debt owed by WIND Hellas to HTIII, HTIV and HTV);

(m)    as soon as possible after the Administration Orders have been issued, a hearing in respect of the relief herein requested, in short to provide that the Scheme shall be given full force and effect in the United States and is binding on all persons subject to the jurisdiction of this Court, will, with the leave of this Court, be held;

(n)    as soon as possible after the Sale and Purchase Agreement has been executed, and provided the relief requested herein has been obtained, HTV will instruct the depositaries to effect the Transfer of the Scheme Creditors' book entry interests in the SSNs to a custody account in Bidco's name and the Transfer will then take place (the date on which the Transfer takes place, the "Senior Note Transfer Date");

(o)    The sale of the Target Assets to Bidco will constitute a disposal made in accordance with Clause 8.5(a) of the Intercreditor Agreement, entitling the Security Agent to release, on behalf of each "Creditor" and "Obligor", all "Transaction Security" and "Claims" under the "Finance Documents" (all as defined in the Intercreditor Agreement); accordingly, as soon as possible after the Senior Note Transfer Date, the RCF Agent and the Trustee, acting on the instructions of at least 66⅔ of the RCF Lenders and a majority of more than

31

75% of the Senior Secured Noteholders, will instruct the Security Agent to execute Deeds of Release (the "<u>Deeds of Release</u>") releasing all Transaction Security and Claims under the Finance Documents (including the claims of the Senior Unsecured Noteholders) to the extent permitted by the Intercreditor Agreement (the "<u>Release Instructions</u>"); the Deeds of Release will not release claims to principal and interest under debt obligations, as such releases are not permitted under Clause 8.5(a) of the Intercreditor Agreement;

(p) as soon as possible after the delivery of the Release Instructions, the Sellers will complete the Sale and Purchase Agreement, pursuant to which Bidco will pay the Purchase Price, which will be allocated as follows:

    (i) €300,000 will be paid to the Existing Parent, of which €250,000 will be paid in respect of the WIND Hellas shares and €50,000 in respect of certain rights of the Existing Parent;

    (ii) €133,843,790 will be paid to HTIII, of which €133,834,837 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €8,953 in respect of certain other rights of HTIII;

    (iii) €68,762,985 will be paid to HTIV, of which €68,758,386 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €4,599 in respect of certain other rights of HTIV; and

    (iv) €544,893,225 will be paid to HTV, of which €544,856,777 will be paid in respect of the debt it is owed by WIND Hellas under a corporate bond programme and €36,448 in respect of certain other rights of HTV;

(q) each of the Existing Parent, HTIII, HTIV, and HTV will request that its share of the Purchase Price related to the debts under the corporate bond programmes be paid direct to the Security Agent; the Existing Parent will also request that its share of the Purchase Price related to its shares in WIND Hellas be paid directly to the Security Agent; the consideration payable in respect of those companies' other rights shall be paid directly to the companies themselves;

(r) as soon as possible after payment of the Purchase Price has been made, the following steps will take place:

    (i) the Administrators and the Sellers will transfer the Target Assets to Bidco;

    (ii) Bidco shall be registered as the holder of all of the issued shares in WIND Hellas;

    (iii) the Security Agent will execute and deliver the Deeds of Release, releasing the security granted over the assets of WIND Hellas and the shares in WIND Hellas; and

    (iv) the Security Agent shall distribute that portion of the Purchase Price relating to the debts of the Administration Companies in administration under the corporate bond programmes and the Existing Parent's shares in WIND Hellas in accordance with the payment mechanics contained in the Intercreditor Agreement – the RCF Lenders and Hedging Banks will be repaid in full from the proceeds of sale, with any remaining proceeds to be paid to the Trustee for application towards the Senior Secured Debt, which will at this point be held by Bidco and can be used to satisfy the Daylight Facility.

32

69. The Restructuring steps outlined above are to occur sequentially in the order set out in the Scheme. It is important to note that in the event that one of the steps does not occur, to the extent permitted by law all other steps will then not occur, and any actions taken under or pursuant to prior steps under the Scheme shall, to the extent permissible by law, have no valid or binding legal effect.

## STATEMENT PURSUANT TO
## SECTION 1515(c) OF THE BANKRUPTCY CODE

70. I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

71. In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Debtor that is known to me is the UK Proceeding.[37]

## LIST PURSUANT TO
## BANKRUPTCY RULE 1007(a)(4)

72. I am informed that Federal Rule of Bankruptcy Procedure 1007(a)(4) provides as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

73. In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the

---

[37] In addition to the Convening Court Order attached hereto as Exhibit A, the Judgment of the UK Court in connection therewith is attached hereto as Exhibit L.

NEW YORK 7928515 (2K)
RLF1 3628585v. 1

following lists:

### Corporate Ownership Statement

74.     Pursuant to Federal Rule of Bankruptcy Procedure 7007.1, the following corporations directly or indirectly own 10% or more of the Debtor's equity interests:

> WIND Hellas Telecommunications S.A.
> Hellas Telecommunications (Luxembourg) S.à r.l.
> Weather Finance III S.à r.l.
> Weather Finance II S.à r.l.
> Weather Finance I S.à r.l.
> WIND Telecomunicazioni S.p.A.
> WIND Acquisition Holdings Finance S.p.A.
> Weather Investments S.p.A.
> Weather Investments II S.à r.l.
> April Holding
> OS Holding

In the cases of Weather Investments II S.à r.l., April Holding and OS Holding, this information is provided on the basis of the Debtor's investigations undertaken on November 12, 2010 into the publicly available records at the Camera di Commercio Industria Artigianato e Agricoltura in Rome, the Memorial C in Luxembourg and the Registrar of Companies in the Cayman Islands.

75.     The Debtor does not have access to comprehensive information on all of the companies which may have indirect ownership interests in it.  In particular, April Holding and OS Holding are categorized as "exempt" companies in the Cayman Islands, and therefore no information regarding their ownership is publicly available (or otherwise known to the Debtor). The Debtor is seeking such information and will update this list to the extent further information becomes available.

### Administrators in the UK Proceeding

76.     Alastair Beveridge (and, failing him, Simon Appell), both of Zolfo Cooper LLP, 10 Fleet Place, London EC4M 7RB, United Kingdom, were appointed by the Resolution of

34

Appointment and declared authorized by the UK Court to act as foreign representative for the purposes of Chapter 15 proceedings in the United States pursuant to the Court Convening Order. I am unaware of any other persons or bodies authorized to administer foreign proceedings of the debtor.

### Parties to Litigation in the United States

77.     As of the date of this Declaration, the Debtor is not a party to any litigation pending in the United States of which I am aware.

### Entities Against Whom Provisional Relief is Sought under Section 1519

78.     The Petitioner is not currently seeking any provisional relief but reserves his right to do so should the need arise.

-------------[The remainder of this page is left intentionally blank]------------

NEWYORK 7928515 (2K)
RLF1 3628585v. 1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 12, 2010
       London, United Kingdom

Michael Corner-Jones